## Ammann *v.* Ammann, Appellant.

*Divorce—Adultery—Evidence.*

Where in a libel for divorce on the grounds of adultery, the inferences of guilt are fairly deducible from the testimony, a decree in divorce is properly granted, although there is no direct evidence to establish the offense.

It is well settled in Pennsylvania that adultery need not be established by direct proof. The circumstances are sufficient whenever they would lead the guarded discretion of a reasonable and just man to a conclusion of guilt.

Argued November 9, 1926. Appeal No. 14, October T., 1926, by respondent from decree of C. P. No. 5, Philadelphia County, June T., 1922, No. 287, in the case of William Ammann vs. Della N. Ammann. Before PORTER, P. J., HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ. Affirmed.

Libel in divorce. Before SMITH, J.

The facts are stated in the opinion of the Superior Court.

The case was referred to Robert W. Archbald, Jr., Master, who recommended that a divorce be granted. On exceptions to the Master's report, the Court dismissed the exceptions and granted the divorce. Respondent appealed.

*Error assigned* was the decree of the Court.

*Otto Kraus, Jr.,* and with him *Edgar N. Black,* and *Golder, Felger & Lemisch,* for appellant.

*Thomas S. Lanard,* for appellee.

OPINION BY TREXLER, J., March 3, 1927:

The libel charges adultery. The answer denies the commission of the offense, alleges condonation if the offense was committed and presents a counter-charge of infidelity. We agree with the master and the lower court that the divorce should be granted.

The testimony shows that from their marriage in 1910 to the winter of 1921, the married life of these people was harmonious except that the husband's violent temper occasionally got the better of him. In the latter part of 1921, he noticed a change in his wife's demeanor and hired detectives to shadow her. The other party in the triangle was one John May. The libellant accused his wife of going with May. She says that she merely visited the May family with her sister. Later, according to libellant's story, May told libellant that he loved his wife and that the libellant would be willing to give her up, if he knew how far he (May) had gone with her. After this, he again charged his wife with intimacy with May and she admitted that she went to May's house every Thursday; that they lay together on the bed and, to use a mild term, fondled each other and on one occasion had intercourse. After this confession, the libellant states that he had no further intercourse with his wife either social or conjugal. After a time, she left him and went to live with a family called Allsopp, Mrs. Allsopp being her sister. May, who was an electrician, wired the house where Mrs. Ammann had taken up her abode and one of the witnesses who worked there testified that when he arrived at 8:00 A. M. May was there

and that when he left at 10:00 P. M., May was still there. The next morning he went upstairs and they were both in the front bedroom. She was lying on the bed dressed and May had his shoes off. The shoes were under the bed. The bed had been made up, but showed "that they had just been laying on it." May frequently sent fruit to the house and "glass goods." He was frequently seen by witnesses at the house where Mrs. Ammann was. Mrs. Ammann told a friend that Mr. May was the cause of her trouble, that she had made a mistake, that he was a scoundrel and that she tried to get rid of him. The detectives who shadowed May saw him go into the house on an occasion and watched the house without seeing May leave until 12:00, meanwhile, the house was darkened; saw Mrs. Ammann and Mr. May leave the house in an auto with two suitcases; another witness testified that Mrs. Ammann had told him that she had trouble lately with May and that he had blacked her one eye; other witnesses testified of seeing them on various occasions.

Mrs. Ammann, before she left her husband, came to see May at his home two or three times a week, so his mother stated. They would sing and dance together and would often be alone in the house. Once when May's mother was away for ten days, she found new curtains in the sitting room which she was told Mrs. Ammann had presented to May. May and Mrs. Ammann hugged and kissed each other frequently. After the trouble at the Ammann house, Mrs. Ammann came to May's residence and told him about it and kissed him when she came and when she left. After Mrs. Ammann had left her husband and went to the Allsopp's house to live, May left his home and went there to live. His mother visited him there. John May, the co-respondent testified to a long course of friendship between him and the libellant. He was not asked as to whether they had committed adultery. May

made various trips with Mrs. Ammann and also received a number of presents from her. The master placed little reliance upon his testimony for the reason that in an answer filed in civil suit brought against him by Ammann, he denied a good many things which he alleges in his testimony. However, in some particulars, he is corroborated by other witnesses and by the admissions in the testimony of Mrs. Ammann.

Her confession, even if we would believe it actually were made, would not be sufficient to found the granting of a divorce upon as the law requires a large quantum of proof. Matchin v. Matchin, 6 Pa. 332. This has been supplied by the libellant. It is well settled in Pennsylvania that adultery need not be established by direct proof. Circumstances are sufficient whenever "they would lead the guarded discretion of a reasonable and just man to a conclusion of guilt." Matchin v. Matchin, supra. Cook v. Cook, 85 Pa. Superior Ct. 403. It is very evident from the testimony that these parties were very fond of each other. They had abundant opportunity to meet each other and the course of conduct in which they persisted for sometime and which in spite of contradictions is abundantly proved, would lead anyone to believe that they did not seek each other for mere caresses, which under the circumstances were highly improper, but that they consorted for baser purposes.

As to condonation, there is no evidence other than the wife's as to the resumption of intercourse after the husband discovered his wife's infidelity, and he denies it. He asserts that they occupied separate rooms thereafter.

The proof, as to libellant's alleged adultery does not measure up. It is true that the respondent's brother-in-law relates that he went on a fishing expedition with the libellant in company with some other men and several women and that libellant and some

girl occupied the same bed. This is denied by the libellant and his denial is corroborated by a man who was on the same trip and slept with the libellant both nights. The same may be said as to the alleged intimacy between libellant and his stenographer.

The proof that the libellant suffered from a venereal disease failed. The doctors would not give assent to the proposition that the ailment that the libellant had was the result of venereal infection.

The libellant proved his case and the divorce was properly granted. The decree of the lower court is affirmed.