## Pierpoint *v.* Pierpoint, Appellant.

Argued November 21, 1932.

Before Trexler, P. J., Keller, Gawthrop, Cunningham, Baldrige, Stadtfeld and Parker, JJ.

*Desmond J. McTighe,* and with him *Ulysses S. Koons, Larzelere & Wright* and *Henry I. Fox,* for appellant.

*William A. Gray,* for appellee.

Opinion by Parker, J., March 3, 1933:

The question involved on this appeal is whether sufficient evidence was produced in the court below to sustain a decree in divorce on the ground of adultery. Testimony was taken by a master who died before reporting his recommendations, and a second master, basing his conclusions, by agreement of the parties, on the testimony previously taken, recommended a dis-

missal of the petition. The court of common pleas sustained exceptions to this report and entered a decree in divorce. The evidence of the ultimate fact involved was circumstantial, and there were some contradictions as to the basic facts from which inferences were to be drawn.

"It is not necessary to prove the direct fact of adultery; for, being committed in secret, it is seldom susceptible of proof except by circumstances which, however, are sufficient whenever they would lead the guarded discretion of a reasonable and just man to a conclusion of guilt": Matchin v. Matchin, 6 Pa. 332, 338. "It is well settled in Pennsylvania that adultery need not be established by direct proof. Circumstances are sufficient whenever 'they would lead the guarded discretion of a reasonable and just man to a conclusion of guilt' ": Ammann v. Ammann, 90 Pa. Superior Ct. 25, 28; Cook v. Cook, 85 Pa. Superior Ct. 403; Hilton v. Hilton, 66 Pa. Superior Ct. 378; Marshall v. Marshall, 3 Fed. (2d) 344, 40 A. L. R. 624.

Proof of an adulterous inclination or disposition at the time of the act charged, and of an opportunity to satisfy such inclination, is relevant evidence in such cases, and if occurring under circumstances that would lead the "guarded discretion of a reasonable and just man to a conclusion of guilt," is sufficient to justify a decree in divorce. The proofs must be clear and satisfactory, established by "clear proofs of imperious reasons." We apply the rules governing human conduct which we all know as the result of common observation, experience, and understanding. Since the intent and disposition may be known only by the declarations and acts of the parties toward or with respect to each other, their conduct both prior and subsequent to the act charged is relevant. "That this desire at a prior or subsequent time is relevant to show the probable existence of the same desire at the time in

issue is equally clear": 1 Wigmore on Evidence, p. 738.

Turning our attention first to the evidence of adulterous disposition, we find that this was shown by the admissions of the respondent and proofs of which there was scarcely slight contradiction. In fact, they disclose not only an adulterous disposition, but an infatuation between the parties. Pierpoint and his wife separated in March, 1925, the wife continuing to live in their former home and the husband leaving. There resided in the house with her an aged aunt who was hard of hearing and apparently oblivious to her surroundings, a colored maid, and, during a portion of the time, a young daughter of respondent by a former marriage. The aunt died before the testimony was concluded. In October, 1925, the respondent, who was about 35 years of age, formed the acquaintance of the corespondent, Venai. He was somewhat younger than she, but immediately became her constant companion and associate. His car was seen almost continually, day and night, in front of her residence. She used and drove the car when she wished. Together they attended movies, visited friends' houses, and dined. They were frequently alone together in the house when both she and the corespondent admit they hugged and kissed each other. She volunteered that she had a very affectionate disposition, but added that it was a motherly feeling. While she states that when alone he left before midnight because she did not like to stay up late, there is evidence of later hours. She entertained mixed couples in her home at "hilarious" parties with Venai as her companion. To conclude that this association was platonic is a severe tax on human credulity.

The libellant relies principally upon events occurring on November 28 and 29, 1925, to furnish proof of opportunity. There are here some contradictions. There was, however, ample evidence by the libellant,

corroborated by other witnesses, to show the facts which we will now detail. On November 28th, two men and two women came to her home early in the evening, and about the same time corespondent arrived. The libellant and an associate watched the house from the early evening of November 28th until the following morning and did not see any other persons in the house than the usual occupants and these five guests. There was a lively party continuing until 2:30 A. M., when the four visitors left the house after being bid goodnight at the door by Mrs. Pierpoint and Venai. These two returned to the house and started upstairs, the lights were turned out downstairs, and immediately lights appeared in Mrs. Pierpoint's room and in an adjoining bath room but at no other place in the house. These lights were turned out in her room about 4 A. M. At 9 A. M. the following morning, the libellant with a brother, a business associate, and a police officer, approached the house and three of them were admitted by the respondent who was clad only in a negligee and "mules." Entering they found the coat and vest of Venai downstairs. The beds in rooms other than those occupied by the aunt, the colored servant, and Mrs. Pierpoint were undisturbed. When the intruders started to the third floor, Mrs. Pierpoint called out to Venai that he might as well come down, but going to that floor they found corespondent in the maid's room lacing his shoes, but much confused. Mrs. Pierpoint and Venai swore that he occupied a room near the maid's room that night, and that being alarmed in the excitement that attended the approach of the officer, he went to the maid's room. But one bed on this floor was disturbed.

On the part of the respondent, it was testified that there were three guests who remained in the house all night, leaving about 8 A. M. for Atlantic City, during the only time—an interval of about an hour—that the house was not guarded. The woman guest testified

that she slept with Mrs. Pierpoint, and this witness and one of the male guests testified that Venai went to the third floor when they retired. We have not detailed all the testimony, but believe that the lower court wisely rejected the testimony of respondent and her witnesses and believed that of the libellant. Any doubt that might have existed on this score was removed by reading the testimony of the respondent and corespondent. One cannot read this evidence without coming to a conclusion that respondent was guilty. The failure of the respondent to call the colored maid warranted an inference unfavorable to the respondent: Green v. Brooks, 215 Pa. 492, 496, 64 Atl. 672. From the testimony, it is apparent that she was present in the house at the time of this occurrence and was very active in the support of the respondent.

We have carefully read the voluminous record, which the parties were unable to print, with full appreciation of the duties that devolve upon us, and while loath to condemn the respondent and deprive her of the most sacred thing possessed by a woman, we can come to no other conclusion than that the testimony is clear and satisfactory and sufficient to establish in the mind of any fair, unbiased, and open-minded person that the respondent was guilty.

The learned master, while conceding the force of the damaging testimony given against the respondent and the vacillating testimony of the corespondent, concluded that he could not find the respondent and corespondent guilty, and suggests that, while their conduct would have pointed to but one result a hundred years ago, yet "in these days of the thorough expression of the individual and the abandonment of almost all of the old conventionalities by those who live in and about the larger cities of our country," a different inference should be drawn. We agree that customs change and that different conclusions are to

be drawn from conduct in different countries and times, yet the rules of logic and human nature have not changed. We are dealing with the same impulses that have been recorded in prose and verse, sacred and profane, in the history of several thousand years. "It is very evident from the testimony that these parties were very fond of each other. They had abundant opportunity to meet each other and the course of conduct in which they persisted for sometime and which in spite of contradictions is abundantly proved, would lead anyone to believe that they did not seek each other for mere caresses, which under the circumstances were highly improper, but that they consorted for baser purposes": Ammann v. Ammann, 90 Pa. Superior Ct. 25, 28.

The decree of the lower court is affirmed at the cost of the appellant.