## Asher *v.* Asher, Appellant.

Argued October 8, 1947. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Joseph Matusow,* with him *Daniel Marcu,* for appellant.

*George H. Detweiler,* with him *Robert A. Detweiler,* for appellee.

OPINION BY DITHRICH, J., January 8, 1948:

In this action in divorce the husband charges his wife with adultery. He was granted a divorce on that ground and the respondent has appealed.

On March 23, 1946, respondent, aged 45, and her paramour, the co-respondent, aged 28, were discovered together on the sleeping floor of the residence of libellant and respondent under such circumstances as to lead to no other reasonable conclusion than that an adulterous relationship existed between them. The co-respondent, with nothing on but his underclothes, was hiding under a bed in libellant's bedroom when libellant, accompanied by a mutual friend of his and his wife and two professional investigators, entered the sleeping quarters of his home. The respondent, scantily attired, when asked by libellant where her "boy friend" was, denied that there was anyone with her and was persistent in her denial until the co-respondent was discovered hiding under the bed by one of the investigators. His explanation of his conduct was that he had gone into libellant's bedroom to change his clothes and had just removed his outer work clothes preparatory to taking a shower when he heard libellant enter the house, and he was so "scared" that he hid under the bed. He said the street clothes into which he intended changing were hanging on a hook in back of the door in the bedroom, but no mention was made of them until after he had been taken to the police station.

He and respondent had been seeing each other regularly since January of 1945, when he was introduced to respondent by her daughter, and on occasion they had been seen together under such circumstances as were entirely incompatible with her professed status as a virtuous wife, faithful to her husband who was then serving with the Armed Forces in the Pacific.

The chief burden of respondent's argument on this appeal is that, assuming she had the inclination or disposition to commit adultery on the night in question, sufficient time had not elapsed between the departure of her daughter and the latter's fiance from the house and the entrance of her husband to permit of the adulterous act. True, the time was short but judging from the appearance of the person of the co-respondent, as testified to by the husband, if the act was not completed it was only because it was interrupted by the unexpected arrival of libellant and his witnesses. In their presence the respondent made this significant comment to her paramour, "Leo, you said that louse wouldn't go to New York today." The remark indicates that they had been concerned about whether or not the husband would return home that evening and that it had been a subject of discussion between them. But husbands can be very unaccommodating on occasion, especially if they have just cause to be suspicious of their wives. March 23, 1946, was not the only time the couple had been seen together under suspicious circumstances. We quote the following excerpts from the adjudication of the chancellor:

"The libellant, recently a colonel in the army, testified that he was 'coolly' received by the respondent when he returned from overseas duty; that on a few occasions, shortly after his return, she absented herself from their home overnight, and his protests were met by unsatisfactory explanations; and that on January 17, 1946, at about 4:20 A. M. the respondent came home in a taxicab, alone, and 'reeked of liquor and her blouse was bloody.' . . .

"The libellant was corroborated as to the occurrence in the sleeping quarters of his home on March 23, 1946, by a mutual friend of the family, . . . by professional investigators, . . . and as to what occurred in the kitchen by police officers, . . . The McKentys [investigators] also testified that they followed the respondent on a number of occasions, beginning February 2, 1946,

and found her, on these occasions, spending her time in the company of the co-respondent in various cafes, tap-rooms, a club and in the home of the co-respondent's mother and step-father, where the co-respondent also resided. . . .

"The parties have been married since April 7, 1923, and they are the parents of two fine children. They are above average in intelligence, have enjoyed very comfortable circumstances and an excellent standing in the community. There is no doubt, however, that a coolness existed between them before the libellant joined the army, and that the respondent's conduct after his return from overseas gave him reason to suspect her fidelity. He was within his rights in taking means to procure proof of any wrongdoing on her part, and this he did, with the assistance of a mutual friend and two private detectives. In this connection, it is to be noted, that the libellant did not lay any temptations in the respondent's way; he merely left open the opportunities which he suspected. Our Superior Court has, on a number of occasions, made it clear that the testimony of detectives who are employed in divorce cases is open to suspicion and must be carefully scrutinized. The trial judge has applied the admonition of the Superior Court to the testimony of the detectives and is impelled to but one conclusion, i. e., that they are truthful witnesses. The libellant was clear and convincing in his testimony and the trial judge is of the opinion that he is to be believed. . . . On the other hand, the testimony of the respondent and her witnesses, in particular that of the co-respondent, has been weighed and found wanting."

Upon our independent examination and consideration of the record, we arrive at a similar conclusion. As we stated in the beginning the evidence is such as to lead to no other reasonable conclusion than that the respondent was unfaithful to her marriage vows. The grounds alleged in the libel were proved by clear and satisfactory evidence.

A century ago Chief Justice GIBSON in *Matchin v. Matchin*, 6 Pa. 332, enunciated the rule of policy to be applied to such evidence as is before us in this case. He said, page 338:

"It is a fundamental rule, . . . that it is not necessary to prove the direct fact of adultery; for, being committed in secret, it is seldom susceptible of proof except by circumstances which, however, are sufficient whenever they would lead the guarded discretion of a reasonable and just man to a conclusion of guilt."

There is no doubt as to the nature of the rule or difficulty in its application to the evidence in this case. Furthermore, as stated by this court speaking through Judge, later Mr. Justice, PARKER in *Pierpoint v. Pierpoint*, 108 Pa. Superior Ct. 108, 110, 164 A. 808:

"Proof of an adulterous inclination or disposition at the time of the act charged, and of an opportunity to satisfy such inclination, is relevant evidence in such cases, and if occurring under circumstances that would lead the 'guarded discretion of a reasonable and just man to a conclusion of guilt,' is sufficient to justify a decree in divorce. The proofs must be clear and satisfactory, . . ." See also *Lisle v. Lisle*, 128 Pa. Superior Ct. 533, 194 A. 207; *Isaacs v. Isaacs*, 149 Pa. Superior Ct. 508, 27 A. 2d 531; *Tuirner v. Tuirner*, 150 Pa. Superior Ct. 110, 27 A. 2d 434.

Decree affirmed.