## JAMES HYATT MATCHIN v. CHRISTIANN MATCHIN.

A wife's insanity is not a bar to a divorce for adultery committed by her when she was insane.

Her confession of the fact is competent evidence of it against her, only when it is cor-roborated by circumstances, and free from suspicion of collusion.

The confession of her paramour is evidence against her, only when it has been com-municated to her, and confirmed by her.

The fact of adultery may be proved by circumstances, with or without her confession.

*July* 30. This was an appeal by a wife, from a sentence of divorce *a vinculo matrimonii*, by the Common Pleas of Columbia county. The libel charged adultery, with the usual averments of time and circumstances; to maintain which, the libellant adduced the following depositions taken on commission:

Clarina H. Frick proved the appellant's marriage with the appel-lee, in May, 1840.

Samuel Yorks.—I am acquainted with James H. Matchin, and Christiann Matchin, his wife. Dr. Yeoman, Michael Grier, and myself, went to Matchin's house in the middle of February, 1846, and found Mrs. Matchin alone with her children. Dr. Yeoman stated to Mrs. Matchin that there was a report that she had had

criminal connection with Benjamin Williams. She denied it, and began to cry and went out. In a few minutes she returned again. Then Dr. Yeoman asked her if she wished any of us to leave the room. She said that Mr. Yorks and Mr. Grier might walk out, and we did walk out. After a few minutes, Dr. Yeoman called us, and we returned to the room she was in. Then Dr. Yeoman said to her, 'I want you to say before these men, what you said to me.' He asked her if she had had criminal connection with Benjamin Williams, and she said, Yes. Dr. Yeoman told her it was reported she had had unlawful intercourse with Benjamin Williams in Williams's barn, and she admitted it was true. She confessed she was guilty of the crime.

Michael C. Grier.—In the winter of 1846, I believe about the middle of February, with Dr. Yeoman and Mr. Yorks, I visited Mrs. Matchin,—the three of us composing the session of the church, to which Mr. and Mrs. Matchin belonged. She was told by Dr. Yeoman, that there was a report that she had had criminal connection with Benjamin Williams. She at first denied it, but after the time and place, and other particulars were stated to her, she, without hesitation, deliberately and fully confessed her guilt in that matter, and also admitted that she had had criminal connection with Benjamin Williams in the barn of Williams, at the time stated. In the evening of the same day, I met Benjamin Williams in Mr. Cooper's office, and in the presence of Mr. Cooper, Mr. Comly and myself, Benjamin Williams fully confessed that he had had criminal connection with Christiann, the wife of James H. Matchin, in Williams's barn, at the time Mr. Cooper charged him with having had such connection, and at the time Mrs. Matchin confessed she had had criminal connection with him. Williams, also, confessed that he had repeatedly had criminal connection with her, and declined stating how long such intercourse had existed between them. I do not remember the day he, Williams, was charged with having had criminal connection with Mrs. Matchin, but it was a few weeks before the time of confession.

Mary Lunger.—In January, 1846, on a Tuesday evening, Mrs. Christiann Matchin came into our house as usual. She looked at the watch when she came in and when she went out. She said she would have to return home, her child would be fretting, and I went to the window to look which way she went. She went up the alley towards Williams's barn, which is not in the direction of her house. It was about seven o'clock in the evening. She stepped on alone the length of our lot, and then stopped and stood there until Benjamin Wil-

liams passed me and overtook her, and they went on together out of my sight, in the direction of Williams's barn. I stood at my gate when Williams passed me. I saw John C. Grier coming from the direction of Williams's barn shortly after Williams and Mrs. Matchin went up. I did not see either Williams or Mrs. Matchin return that evening. I reside in Danville, and Williams's barn is on a lot adjoining ours.

John C. Grier.—On the evening of January 27, 1846, James H. Matchin called on me, and told me he suspected his wife's fidelity, and that she had an appointment that night to meet Benjamin Williams at his (Williams's) stable, and asked me to go there at that hour, and watch them. At first, I refused, telling him it was a delicate matter; but on his further urging and pleading with me, I consented to go, if some other person went with me. He told me that Archibald Vorhees would go with me. At 6½ o'clock that evening, Vorhees and myself left my store, prepared with matches and lanterns, and proceeded to the stable used by A. G. Vorhees as a lumber house, opposite Williams's barn. About ten minutes before seven o'clock, Benjamin Williams came and opened his stable door, which leads into the alley, and stepped into the alley, holding the door partly open in his hand for a moment or two, and looked up and down the alley. He then closed the stable doors and walked down the alley to the street opposite Matchin's house, and came back to his stable door again, and stood by it, when a dog commenced barking at him. He picked up something and threw it at the dog, and chased him away. Then he went down the alley again, and stood in the street opposite Matchin's house. While he was standing there, Mrs. Christiann Matchin came up the alley to Williams's stable door, and stopped there, and looked up and down the alley for a few minutes, and then went down the alley to the corner of Mr. Lunger's stable, where she was met by Benjamin Williams, who came up the alley from towards Matchin's house. They joined arms, and went to Williams's stable door, at which point they were met by some one coming down the alley whom I did not recognise. They then went up the alley. Mr. Vorhees followed them up the alley, and soon returned. We did not see Williams and Mrs. Matchin again that evening.

The deposition of Archibald G. Vorhees was to the same effect as that of the preceding deponent.

Lydia Matchin.—I am acquainted with James H. Matchin and Christiann Matchin, his wife. I lived with them on the 27th day of January, 1846, and some time before that. On the morning of that day, Mrs. Matchin told me that she had an appointment to

meet Benjamin Williams at Williams's barn. .I told this to James H. Matchin the same morning. She left the house that evening about seven o'clock, and returned home about eight o'clock in the evening. When she returned, her dress was disordered, and there was straw on it, and I picked some of it off. The same evening after her return, she told me she met Benjamin Williams in the alley near Williams's barn. They became alarmed. They went up the alley and passed the Episcopal church, and went through the door of Williams's wood-house. She remained there, and Williams went on into the garden. Then he whistled for her and she joined him, and they went together into Williams's barn, and there Williams had carnal connection with her. The same evening I told these confessions to James H. Matchin.

John Cooper, Esq., sworn.—On the 16th day of February last, Mr. Comly, Michael C. Grier, Benjamin Williams, and myself, met in the afternoon, in my office, and I then and there accused Benjamin Williams of having committed adultery with Christiann Matchin. He said it was false. Then Mr. Comly stated to him, that Christiann Matchin had confessed her guilt to Michael C. Grier, Dr. Yeoman, and Samuel Yorks, and stated to him that on the 27th day of January last, at seven o'clock in the evening of that day, he had met Christiann Matchin, by appointment, and that some one coming down the alley had interrupted them, and that they had gone round by the Episcopal church, until they had arrived at the door of Williams's wood-house; that Williams went into the garden, leaving Mrs. Matchin in the wood-house. He then whistled for her to come to him; that she joined him in the garden, and went thence into the barn, and there Williams had carnal connection of her body; and told him he had been watched by John C. Grier and Archibald G. Vorhees. I asked him then if what Mr. Comly said was true or not true. He answered, you know all about it, and there is no use of denying it. He afterwards admitted that he had had carnal connection with her, not only on the night of the 27th of January last, but several times before, but how long this connection had subsisted, he declined to answer. The next morning, Benjamin Williams absconded from Danville, and has not returned since.

The appellant gave no evidence, but appealed from the sentence of divorce to this court.

*Jordan*, for appellant.—Decree of divorce was based upon insufficient and illegal testimony. Such testimony would not have

been received on a trial by jury. The confession of the adulteress was not suppported by facts or circumstances, or by any other kind of evidence: 2 Kent's Com. 98; *Holland v.* Holland, 2 Mass. 154. The acknowledgment of her paramour was not evidence against her.

*Comly* and *Cooper*, contrà.—The confessions were corroborated by circumstances which destroyed every suspicion of collusion, and were sufficient for the decree of divorce. They cited Shelford on Marriage and Divorce, 33 Law Lib. 225, 410, 411; 4 Am. Com. Law, 530.

*July* 30. GIBSON, C. J.—Though we are bound to determine this appeal on the depositions sent up with the record, they contain enough to warrant a concurrence in the general belief that the appellant was actually insane; for no woman in her senses, however lost to shame, would apprize her husband's kinswoman, by whom her confidence was certain to be betrayed, of an assignation with a paramour. But a wife's insanity, though so absolute as to have effaced from her mind the first lines of conjugal duty, would not be a defence to a libel for adultery, though it would be a defence to an indictment for it. The offence is a social, as well as a moral one; and it is agreed by the civilians to be less grievous. to the sufferer, though not less immoral, when it is committed by the husband, whose transgression cannot impose a supposititious offspring on the wife, than it is when committed by the wife, whose transgression may impose such an offspring on the husband; and hence it probably was—though the kindred fault of barrenness was also cause of divorce—that the right of repudiation was confined, in the primitive ages, to the husband; for there is no instance of an exercise of it by a wife till. the time of Cicero, or shortly before it: Cooper's notes to Justinian, lib. 1, tit. 9, sec. 1, p. 435. A libel for divorce is said to partake of the nature of a criminal proceeding; but the primary intent of it is undoubtedly to keep the sources of generation pure, and when they have been corrupted, the preventive remedy is to be applied without regard to the moral responsibility of the subject of it. It is true, that neither the canon law, nor our own statute, makes any distinction as to sex; but that the legislation of England, to which the dissolution of marriage in that country exclusively belongs, is guided by an opposite principle, is proved by its readiness to divorce for the adultery of the wife, and its reluctance to divorce for the adultery of the husband. There have been but two instances of the latter; and in each of

them, the offence was marked with such circumstances of brutality, that a continuance of the nuptial relation would have reflected the disgrace of the husband on the wife. The distinction is said to be preserved in the laws of many other countries; and though it is not expressly preserved in the application of the remedy under our own, we are nevertheless at liberty to conclude that insanity *might* be a bar to divorce at the suit of the wife, when it would not, in similar circumstances, be a bar to divorce at the suit of the husband. To say the least, adultery committed under the irresistible impulse of that morbid activity of the sexual propensity which is called *nymphomania*, or more recently, *erotic mania*, would certainly be ground of divorce, though not of indictment. The great end of matrimony is not the comfort and convenience of the immediate parties, though these are necessarily embarked in it; but the procreation of a progeny having a legal title to maintenance by the father; and the reciprocal taking for better, for worse, for richer, for poorer, in sickness and in health, to love and cherish till death, are important, but only modal conditions of the contract, and no more than ancillary to the principal purpose of it. The civil rights created by them may be forfeited by the misconduct of either party; but though the forfeiture can be incurred, so far as the parties themselves are concerned, only by a responsible agent, it follows not that those rights must not give way without it to public policy, and the paramount purposes of the marriage—the procreation and protection of legitimate children, the institution of families, and the creation of natural relations among mankind; from which proceed all the civilization, virtue, and happiness to be found in the world. The absurdity of the dogma, that marriage is a *sacrament*, and dissoluble only by the head of the church, instead of a *political status* subject to the power of the state, is manifest.

So far I have treated the subject as if the evidence made out a case of moral insanity, though, in point of legal effect, it does not. Does it prove the *corpus delicti?*

Were the wife's confession sufficient to prove it, the evidence of it would be ample; for she distinctly acknowledged it before the session of her church: indeed, she seems to have made only a show of persistance in denying it, and to have considered that she had done nothing very wrong. Considering her bringing up, which is admitted to have been of the most careful and exemplary kind, this dulness of the moral sense seems to have been a defect in the constitution of her mind. It is a rule of policy, however, not to found a sentence of divorce on confession alone. Yet, where it is full,

confidential, reluctant, free from suspicion of collusion, and corroborated by circumstances, it is ranked with the safest proofs. There is no doubt as to the nature of the rule, or difficulty in its application to the evidence before us. The facts resulting from it are, the wife's disclosure of the assignation to her husband's kinswoman; her absence at the indicated hour; her visit to a neighbour immediately preceding it; her abrupt termination of it, and feigned excuse for going; her presence at the appointed time and place in company with the man she was to meet; the shifting of their ground at the approach of an intruder; the disordered condition of her clothes when she came back; her declaration to her confidant the same evening, and confession to the church session next morning: these, together, make up the sum of plenary proof. To say nothing of the confession of her accomplice, which, not having been communicated to her, and confirmed by her, was not evidence to affect her, there was enough for the purpose of inculpation without the confession of either. It is a fundamental rule, said Lord Stowell, in Loveden v. Loveden, 2 Haggard, 2, that it is not necessary to prove the direct fact of adultery; for, being committed in secret, it is seldom susceptible of proof except by circumstances which, however, are sufficient whenever they would lead the guarded discretion of a reasonable and just man to a conclusion of guilt. On this principle, a wife's visit with a man to a brothel, or to a man at his lodgings, has been held sufficient proof of it, because it is impossible to assign an innocent motive for such a meeting; nor can an innocent motive be assigned for meeting a man in the dark at a barn-door, in a secluded alley, with the stealthy and shrinking timidity of conscious impropriety. That the preconcerted design was partly put in act, is as convincing evidence of the consummation of it, as would be the testimony of an eye-witness to the fact. There was nothing but the will of the parties themselves to stop them. We are of opinion, therefore, that the sentence is sustained by legal and sufficient proof.

Sentence affirmed.