## Wilson *v.* Wilson, Appellant.

Argued November 18, 1930.

Before Trexler, P. J., Keller, Linn, Gawthrop, Cunningham, Baldrige and Whitmore, JJ.

*John E. McDonough,* for appellant.

*Robert W. Beatty,* and with him *C. William Kraft, Jr.,* for appellee.

OPINION BY GAWTHROP, J., January 30, 1931:

The libel charges adultery by the wife. The master found that the charge was sustained by the evidence and recommended that a divorce be granted. The opinion filed by the learned judge of the court below clearly indicates that he carefully reviewed the testimony and exercised his independent judgment in passing upon the question whether appellant committed adultery with the co-respondent. We are convinced that the correct conclusion was reached.

Libellant, aged thirty-eight, was married to respondent, aged thirty-two, in June, 1927. Soon thereafter he established a home in Drexel Park, Delaware County, where they resided until October 24, 1928. A short time before the marriage they became acquainted with Joseph L. Hildebrand, aged thirty-two, an agent for a plumbing supply house in Philadelphia, who maintained a home for himself and his wife and children in Baltimore, and occupied, with one Welsh, an apartment consisting of two rooms and a bath at 4311 Walnut Street, Philadelphia. The friendship between Hildebrand and respondent grew more intimate and her interest in her husband waned. After June, 1928, she and her husband did not go out together. She went out alone and usually did not tell him where she was going. In June, 1928, she expressed to him a desire to start a tea room. He advanced $1,800 to support the enterprise and she opened a tea room in Brookline September 4, 1928. Hildebrand helped respondent in the arrangement of the

decorations in the tea room. Libellant objected to this and other attentions paid by him to respondent, and on one occasion emphatically stated to him his objections to the attentions he was paying to respondent, but their intimacy increased. It is admitted that respondent made frequent visits to Hildebrand's apartment, sometimes in company with others and sometimes alone; that he called to see her frequently at the tea room; that he took automobile rides with her in the country until midnight; and that they drove together to Baltimore and returned late at night, without the knowledge or consent of libellant. Libellant became suspicious of respondent's conduct, consulted counsel and, in the month of October, 1928, employed a detective agency to secure and report information as to her actions. On October 18, 1928, one of the detectives saw Hildebrand get into respondent's car at 8:30 in the evening and sit there for two hours. He testified that she had her head on his shoulder. On Sunday morning, October 21st, about 9:10 o'clock he saw them coming out of the door at 4311 Walnut Street where Hildebrand lived. The latter was carrying a valise. This is the day they drove to Baltimore in her car. She admitted that she went to his apartment that morning and had coffee with him and Welsh before starting on the trip. The witness testified that on the following night, October 22nd, he followed them to Wayne where they drove into a side road, stopped the car, dimmed the lights and sat for two and a half hours. On Tuesday night, October 23rd, libellant and four detectives found respondent and Hildebrand alone in his apartment about 11 o'clock P. M. He was undressed—clad only in a suit of underwear. According to the testimony of libellant and four detectives, they went to the door of Hildebrand's apartment that evening at 11:10 o'clock. One of the detectives tried the door and, finding it locked, knocked several times.

Presently a man's voice inquired what was wanted. The chief detective said he had a telegram. Hildebrand, clad only in his underwear, opened the door and libellant and the detectives entered the living room in which a light was burning. They walked on to the bedroom where there was no light and, according to the testimony of these five witnesses, respondent was under the covers in one of the two beds, fully dressed except as to her shoes which were under the bed. The covers of the other bed were undisturbed. At the suggestion of the chief detective libellant then left the apartment. The chief detective testified that he asked Hildebrand to give him "a statement of what had been going on," and that Hildebrand said that Mrs. Wilson had been there that night to nurse him, and that in response to the suggestion that he had had sexual intercourse with her, he denied that he ever had it, but admitted that he had "been loving and kissing her." It appears that shortly after October 23rd libellant instituted criminal prosecutions against his wife and Hildebrand, charging them with adultery. Subsequently he agreed to the taking of a verdict of not guilty in the cases because, according to his testimony, "I didn't want to bring any more embarrassment to the case than it was possible to bring in, neither to anybody, particularly my wife's mother." It also appears that libellant and Hildebrand exchanged releases at this time.

The defense was a denial of any misconduct on the part of respondent and Hildebrand. They explained their presence alone together in Hildebrand's apartment on the night of October 23rd by the statement that he was ill; that Mrs. Hildebrand had asked respondent in Baltimore on October 21st to look after her husband; that respondent went to the apartment at 8:30 o'clock P. M. when Welsh was present; that Welsh left at 9:30 to get a mustard plaster to put

on Hildebrand's chest; that Welsh undressed Hildebrand and put him to bed and the latter went to sleep while respondent remained in the living room. She testified that when the detective rapped on the door she went to Hildebrand's bedroom and touched him; that he jumped up and went to the door; that she sat on the bed but was not in it and that she had her shoes on.

Welsh testified that he left the apartment about 10 o'clock after having put Hildebrand to bed; that he had an appointment at Broomall and returned about midnight, and that when he returned he brought a roll of mustard plaster and a bottle of citrate of magnesia; and that he called a doctor for Hildebrand about 3 o'clock A. M. the following morning.

Dr. Fish testified that he attended Hildebrand professionally on October 11th, 15th and 23rd; that when he saw him the first time he had "left-sided pleurisy;" that he continued working "against my wishes;" that when he saw him at the office on October 23rd he told him to go home, and that his pleurisy was worse; that he called at the apartment on the morning of October 24th at 1:30 o'clock and found the patient "had spasmodic coughing......due to his pleuritic condition," and that he had every reason to believe that Hildebrand had incipient tuberculosis in his left lung.

Mrs. Hildebrand testified that her husband was not well when he and the respondent visited her in Baltimore on October 21st, and that she asked respondent to "go and kind of keep a look out for him and let me know if anything comes up, because I am worried about him."

As the sexual act is seldom performed in the presence of eye witnesses, adultery is usually established by circumstantial evidence, rather than by direct proof. Circumstances are sufficient whenever "they would lead the guarded discretion of a reasonable and just

man to a conclusion of guilt:" Matchin v. Matchin, 6 Pa. 332, 338; Davis v. Davis, 91 Pa. Superior Ct. 354. It is clear from the evidence that respondent and Hildebrand were very fond of each other and found enjoyment in each other's society. She sought the pleasure of his society in preference to that of her husband, despite the fact that she knew and Hildebrand knew that the husband objected to the attentions she was receiving from Hildebrand. In view of the course of conduct of these parties, in which they persisted for some time prior to October 23rd, it is impossible for us to assign an innocent motive for respondent's presence at Hildebrand's apartment under the conditions in which she was found on that evening. The master, who is known to us as a lawyer of real ability and wide experience, and who had a much better opportunity to get at the real facts and situation and surroundings of the parties than we can have from the printed record, was convinced that the purpose of the meeting was to gratify their lust. He states in his report that "the intimacy of the co-respondent and his room-mate with the respondent while attending meetings before the master also lacked decency. On one occasion the three were observed, by the master, sitting on the front seat of an automobile with her in the middle." The testimony of Welsh, Hildebrand's room-mate, is not convincing to us, as it was not to the master, and we place little reliance in it. Although Welsh testified that Hildebrand was so sick that he had to be undressed by himself and respondent and put to bed, and that he went out to get a mustard plaster about 10 o'clock, he first went to Broomall, Delaware County, to keep a business appointment, and did not return until after midnight. This is not a case in which the proof rests upon the uncorroborated testimony of detectives employed by the libellant. The testimony of the detectives as to the controlling facts

is substantially admitted. The statement in the brief of the able counsel for appellant that the fact of guilt of adultery is denied by every witness in the case other than paid hirelings who testified on the subject, finds no support in the record. Appellant's course of conduct was inconsistent with her innocence and the inference of guilt is the only one fairly deducible from the evidence.

The only other question requiring our consideration is the effect of the verdict of not guilty in the criminal proceedings against appellant and her alleged paramour in Philadelphia County. The contention made in behalf of appellant is not that the verdict in the criminal cases controlled the result of this proceeding in divorce, but that it "seriously discounts the testimony which he has adduced" in the divorce proceeding. By the great weight of authority, and in the absence of any statute to the contrary, a judgment or sentence in a criminal prosecution is neither a bar to a subsequent civil proceeding found on the same facts, nor is it proof of anything in such civil proceeding, except the mere fact of rendition. So, where the same acts or transactions constitute a crime and also give a right of action for damages or for a penalty, the acquittal of defendant when tried for the criminal offense is no bar to the prosecution of the civil action against him, nor is it evidence of his innocence in such action: 34 C. J. 970. On this subject see Bennett v. Fulmer, 49 Pa. 155; Hutchison v. Merchants' & Mechanics' Bank of Wheeling, 41 Pa. 42. This question requires no further words.

The decree is affirmed.