## Golden *v.* Golden, Appellant.

Argued November 17, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*Michael Edelman,* for appellant.

*I. Bernard Rotberg,* for appellee.

OPINION BY STADTFELD, J., January 31, 1939:

This case is an action for divorce a vinculo matrimonii, brought by Henry Golden, libellant, against his wife, Sarah Golden. The libel alleged as grounds for divorce (1) cruel and barbarous treatment endangering his life; (2) indignities to his person such as to render his condition intolerable and life burdensome; (3) desertion. The master, before whom the case was heard, recommended a divorce on the second and third grounds. The report of the master having been approved, the court below, without filing an opinion, entered a final decree which is assigned as error.

Where an action is heard before a master, we are required to consider the evidence de novo, pass upon its weight and upon the credibility of witnesses, and reach an independent conclusion upon the merits as to whether a legal cause for divorce has been well established: *Huston v. Huston,* 130 Pa. Superior Ct. 501, 197 A. 774.

The burden is upon the libellant to prove his case by clear and satisfactory evidence, and there must be a preponderance of the evidence in his favor: *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 181 A. 69; *Rinoldo v. Rinoldo,* 125 Pa. Superior Ct. 323, 189 A. 566.

The libellant and respondent were married on September 5, 1920, in the City of Philadelphia. Prior to the marriage, both parties lived in said city. Subsequent thereto, they lived together, until their final separation in November, 1930, at various places in said city, excepting a period of ten months, when they lived in Baltimore, Maryland. They have not lived together, nor have they cohabited, since November, 1930.

The libellant, at the date of the master's hearing, was 47 years of age, and his occupation is that of a luggage maker. The respondent was 23 years of age at the date of her marriage in 1920, and, consequently, at the date of the master's hearing, was approximately 40 years of age. Only one child was born as a result of the marriage, a boy, Bernard, 13 years of age, who lives with his mother, the respondent.

The marital difficulties between the parties started immediately after their marriage. On this fact, the testimony of both parties agrees. Their entire married life, according to the testimony of libellant, was a continuous succession of unhappy events and unpleasant incidents. According to the uncontradicted testimony, the libellant was a quiet, timid and gentlemanly person, respected by everyone, including respondent's entire family.

From the testimony we gather the facts that the respondent was of a very jealous nature and nagging disposition; that she constantly told him "you are no good to me"; that she objected to his going to see his parents; and that she called him various vile names.

The record is replete with many instances of indignities. The libellant testified to many instances of a

214

special nature, illustrative of the respondent's character and disposition. When living at 1611 South 6th Street, libellant was forced to take to bed by reason of a tonsilectomy. During the week that libellant remained in bed, respondent utterly neglected the libellant, leaving him for practically the whole day, with no one to attend him. Respondent didn't keep the place clean; the bed in which libellant was lying was dirty; the linens were spotted with evidences of respondent's lack of personal care and infested with bugs. When libellant's mother visited him and saw this condition, she brought clean linens from her own home, and made the necessary change in bed linens herself. When respondent returned and saw what had transpired, she upbraided libellant's mother, calling her vile names and telling her she had no right to come to libellant's dwelling.

In the ten years that the parties lived together, libellant admits that he left his wife and home on three occasions. Once, when the parties lived on Tasker Street, in 1925, the libellant left his family for two weeks; then, when they lived at 1611 South 6th Street, he stayed away two or three months. Each time that libellant returned, it was because of a reconciliation arranged by some relative of the parties, and then only because of respondent's promise that she would behave herself. Libellant admits another inducement, namely, his son. The third time that he left was the last, and that was in November, 1930. Libellant testified that matters came to a point where he "couldn't stand it any more." He further explained, "I got nervous and I picked myself up and left." Prior to leaving in November of 1930, libellant pleaded with respondent to behave herself, in view of his nervous condition and physical ailments resulting from her treatment of him. Respondent answered by calling libellant vile names; she told him to go to hell, and to do as he, the libellant, pleased saying, "I don't want you in here, and you can get out"; she spit on libellant and accused him of going

out with whores. She told him, "I don't need you no more and get out of here," "I am going to make it so uncomfortable for you that you will have to get out." As often as libellant would leave the respondent, he would leave his address, or make known his whereabouts, and would communicate with his family, even sending them money. It would be to no purpose to review the entire testimony in relation to her conduct. The master has epitomized the same as follows: "In the instant case, libellant had no right to say anything or talk to anybody; he was no good, 'a bum,' ...... 'a pimp,' and 'a bastard'; he was ordered around (by respondent) in the presence of other people, and charged with improprieties with old women and children, so that he was 'ashamed of himself'; he was humiliated in the presence of young girls, charged with seeking the company of prostitutes; surrounded with an environment of uncleanliness and a disregard by the respondent of her personal sanitation and hygiene; had to tolerate his own mother being called vile and opprobrious names; being slapped and struck in the face with a piece of bread; locked out of his own home at nights; called 'a bastard' and 'spat' at continuously." The testimony shows various other details of humiliation which served to break down libellant's health and had the effect of rendering the life of this libellant intolerable.

Quoting further from the master's report: "Libellant's charges are, in many important details, corroborated by his two witnesses, Harry Golden, his brother, and Reba Kravitz. All of the charges are categorically denied by respondent and her witnesses in their testimony, which, because of its inconsistency, contradictions and evasiveness, your master does not consider worthy of belief. The testimony of Ida Tuft, Simon Block and Mary Eskin, in contradiction of libellant's charge of respondent's uncleanliness, is entirely rejected by your master. It appears that these witnesses were not sufficiently conversant with actual conditions in

libellant's home to enable them to testify with any degree of reliability, and particularly the testimony of Mary Eskin is evasive, hedging and unworthy of belief.

"Libellant impressed your master as a decent and respectable gentleman. His demeanor and manner of testifying lend considerable verity to his charges against the respondent. His testimony is clear and convincing, and is substantially uncontradicted by credible testimony. It is in many details supported by his witnesses, and, in important phases, finds support in the very testimony of the respondent herself."

Although recognizing that the master's report is only advisory and not controlling, yet as in *Wiley v. Wiley,* 125 Pa. Superior Ct. 547, 549, 190 A. 363: "The report of the master, particularly as regards the credibility of the witnesses, is to be given the fullest consideration, as he has had the advantage of seeing the parties and hearing the testimony."

The master, who was convinced from the credible testimony "...... that libellant's application has been made in sincerity and truth, that the respondent has been guilty of such a course of conduct as is humiliating, degrading and inconsistent with the libellant's position and relation ...... conduct growing out of and inspired by an insulting and contemptuous purpose and intent," concluded that the respondent had rendered the condition of the innocent spouse intolerable and life burdensome.

"It has been repeatedly stated that 'it is impossible to lay down a general rule for the determination of what indignities render the condition of the injured party intolerable. It has been held by many courts (see 14 Cyc. 623) that they may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient' ": *Sharp v. Sharp,*

106 Pa. Superior Ct. 33, at p. 35, 161 A. 453, at p. 454. See also, *Rinoldo v. Rinoldo,* supra.

Having carefully reviewed all the evidence, we have reached the conclusion that the decree should be affirmed as to the charge of indignities.

Decree affirmed.