Cutter, Appellant, *v.* Cutter.

Argued April 11, 1949. Before RHODES, P. J., HIRT, RENO, DITHRICH, ARNOLD and FINE, JJ. (ROSS, J., absent).

*Charles L. Blystone,* with him *Wm. K. Reid* and *Reid & Blystone,* for appellant.

No appearance was made nor brief submitted for appellee.

Opinion by Fine, J., July 15, 1949:

Thomas L. Cutter has appealed from a decree dismissing his libel in divorce wherein he charged his wife with indignities to the person. The respondent offered no testimony in her behalf. The master recommended that a divorce be granted but the court below dismissed the libel on the ground that libellant failed to establish indignities to the person by clear and convincing evidence.

We are obliged to review the record and make an independent investigation of the evidence, pass upon its weight and the credibility of the witnesses, and reach an independent conclusion upon the merits as to whether a legal cause for divorce has been well established: *Bock v. Bock,* 162 Pa. Superior Ct. 506, 508, 58 A. 2d 372; *Golden v. Golden,* 134 Pa. Superior Ct. 211, 212, 3 A. 2d 941; *Sarbiewski v. Sarbiewski,* 127 Pa. Superior Ct. 463, 193 A. 91. So viewing the record, we are of the opinion that the decree must be reversed.

The parties were married in Balboa, Canal Zone, on September 4, 1944, while appellant was on a seven day furlough from the U. S. Army. From that time until April, 1946, (approximately a year and a half) the parties did not see each other because of libellant's military activities. The respondent during that period continued to reside with her parents in Balboa. In April, 1946, libellant was honorably discharged from the army, whereupon the parties moved to Meadville, Pennsyl-

vania, and lived with libellant's parents for approximately three months, occupying a room of their own. Three months later the parties obtained a small apartment in Meadville where they continued to reside until their separation on January 7, 1948.

Marital difficulties commenced almost immediately upon arrival in Meadville. Respondent was completely dissatisfied with her new surroundings, with the cold climate, and with her neighbors, and she unhesitatingly voiced her objections in a sneering and critical manner, not only to her husband but to their mutual friends, much to the embarrassment and humiliation of libellant. While living with libellant, respondent refused to do any housework or to cook his meals, and moreover, wilfully refused to learn how to perform household duties. She devoted almost all of her time to writing poetry and stories and reading books. Libellant was required to do the housework, cook the meals, and wash the dishes upon his return from work with the American Viscose Corporation. Such neglect of household duties, although not in itself sufficient, may be considered in the scrutiny of respondent's conduct. Cf. *Golden v. Golden,* 134 Pa. Superior Ct. 211, 3 A. 2d 941, supra. See Freedman on Marriage and Divorce, p. 784.

During the summer of 1946, libellant desired to continue his formal education and sought to and did enroll in Allegheny College. His wife strenuously disapproved this decision and constantly criticized it. Respondent wanted her husband to matriculate in a college in California or in Balboa so that she could reside in a warmer climate.

Matters became increasingly intolerable especially after December, 1946, when respondent obtained employment in the office of the dean of Allegheny College. Libellant's formal education like that of so many other young men who answered the call of their country had been abruptly halted by his military service and as a

consequence respondent's education was further advanced. She was graduated from college with honors and is a Phi Beta Kappa. In the course of her work in the office of the dean she had access to libellant's records and discovered that his "intelligence quotient wasn't too much above average." This was a crushing blow to respondent causing her to return home crying and to complain that she had "married a moron or an idiot." From this time on respondent, with obvious contempt, flaunted her intellectual superiority over libellant and chided him on his grades in an insulting manner in the presence of their mutual friends; contemptuously and with obvious contumely corrected libellant's grammatical errors in the presence of friends; goaded him by remarking any lazy person could get grades of 80 or 85 but that "it took a man to get the grades in the 90's"; incessantly insulted and ridiculed libellant's inferior intellectual status in the presence of their mutual friends and sneeringly alluded to his mediocre scholastic attainments to such a point that friends refused to visit them as they had done in the past. Libellant testified that respondent refused to have sexual intercourse in the last year of their married life together, (cf. *Bobst v. Bobst,* 357 Pa. 441, 454, 54 A. 2d 898) and she protested that relations of that nature were "crude and vulgar"; that on many occasions she told him she did not love him at the time of marriage but married him because she thought she could learn to love him afterward. The testimony reveals that she was maliciously extravagant although she knew libellant was working in the evenings in order to maintain a home and at the same time finance his education. As a consequence of her conduct, his scholastic grades suffered provoking further taunts about her intellectual superiority. Because of the wife's patronizing conduct, her husband became highly nervous, lost weight and his health and general well-being were seriously im-

paired, which in itself is strong supporting evidence of indignities. *Clark v. Clark,* 160 Pa. Superior Ct. 562, 565, 52 A. 2d 351.

The record is replete with many such occurrences of indignities, their times and places; no useful purpose would be served to relate them in detail. Many of the incidents related by libellant were corroborated in material respects by his witness, a fellow student. More particularly, the witness testified that at various social functions of the college or his fraternity she insulted him and showed her disdain for him and contemptuously paraded her mental and academic superiority; that bridge parties were broken up when the wife hatefully and obnoxiously belittled and ridiculed her husband in the presence of their friends, and otherwise displayed a malevolent disposition.

"The circumstances of each case must largely determine whether the acts charged amount to such indignities as will justify the court in making a decree of divorce. However, indignities to the person, as recognized by the law, have certain fundamental characteristics which must be recognized in the appraisal of the evidence. In the first place, the indignities must consist of a course of conduct on the part of respondent. That conduct must have rendered the condition of the libellant intolerable and life burdensome; and there must be evidence from which an inference of settled hate and estrangement may be deduced": *Monaco v. Monaco,* 160 Pa. Superior Ct. 117, 118, 50 A. 2d 520. Here the respondent continually, constantly and contemptuously pursued an opinionated course of incivil and disdainful conduct, which, as intended, embarrassed and ridiculed her husband rendering his condition intolerable and life burdensome. Her actions may be attributed in part to the impact of her stilted pedantic mind with life's realities and her utter incapacity or arrogant refusal

to assimilate those actualities and to adapt herself to them.

What was recently said by Ross, J. in *Bock v. Bock,* supra, 162 Pa. Superior Ct. 506, at page 509, 58 A. 2d 372, is most pertinent here: "From our examination of the ... record in this case, it is clear that the respondent was domineering, arrogant and contemptuous of [libellant] and apparently during the time the parties lived together made every effort to ridicule her and to hold her up to disdain, not only when the parties were alone but in the presence of visitors to the home. It is in evidence that the respondent habitually and continuously made sarcastic and critical remarks about his wife and her work, and belittled her intelligence to her consequent humiliation and the embarrassment of visitors to the home."

After a careful examination of the testimony of this case, we are all agreed that the libellant has made out a case of indignities to the person by clear and convincing evidence and that the court below erred in dismissing the libel.

The decree dismissing the libel is reversed, the libel is reinstated and the record is remitted to the court below with direction to enter a decree of absolute divorce.