## Shoemaker *v.* Shoemaker, Appellant.

62

Argued June 15, 1962. Before RHODES, P. J., WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (ERVIN, J., absent).

*William J. Moran, Jr.,* with him *Harry N. Moran, Jr.,* and *Hillegass & Moran,* for appellant.

*Raymond M. Seidel,* with him *High, Swartz, Roberts & Seidel,* for appellee.

OPINION BY WOODSIDE, J., September 13, 1962:

This is an appeal from a decree of the Court of Common Pleas of Montgomery County granting a divorce to a husband-plaintiff on the grounds of adultery and indignities.

In February 1943 William Shoemaker, the plaintiff, and Nancy, the defendant, then in their twenties, met one morning at 10 o'clock in a bar. Both were married. At the age of 18, Nancy had married a man in his sixties. William had married while he was intoxicated but had never lived with his wife. On July 16, 1946, after each had obtained a divorce, they married in Reno, Nevada.

Cursed with too much money, too little willpower, no employment, and whatever physiological deficiency may be involved, the plaintiff became an alcoholic. For the security and luxury that the plaintiff's $950,000 trust fund brought to the defendant, she paid the price of living with an alcoholic from the time of their marriage until her husband stopped drinking on July 16, 1957. She was a dutiful wife throughout many trying experiences during the early years of their marriage, but in the end it was she, and not he, who destroyed the marriage.

In 1959, when her husband was successfully fighting his battle against alcohol, she became enamored with Frank Vymetal, a veterinarian who had been treating her cats. He was a recent immigrant from Czechoslovakia with no family and few acquaintances in America. The Shoemakers had befriended him. Both Mr. and Mrs. Shoemaker liked him, and in 1958 they frequently entertained him at their home. He dined with them, swam and danced with Mrs. Shoemaker and played chess with Mr. Shoemaker.

His association with Mrs. Shoemaker grew more intimate, and their meetings became more frequent and more varied. She went to dinner with him, went dancing with him, went to see the Cherry Blossoms in Washington with him, went to the apartments of friends with him, went to his room to see him, and had him at her house when her husband was away.

She made no efforts to hide her affection for Vymetal. "He is a better lover than you," she told her husband. "I love Dr. Vymetal and nobody is going to stop me from seeing him," she told her friend, Mrs. Faller. "I love him and want a divorce," she told another friend. "I love Dr. Vymetal," she told her physician. "Frank is a wonderful lover," she told the assistant trust officer of the Wyoming National Bank. "I had intercourse with him," she told her nurse. She

said that she wanted "Bill for support and Vymetal for love."

On April 15, 1960, the defendant left her husband's home, and went to live alone in an apartment.

The master found that she had intercourse with the co-respondent, Frank Vymetal, on four occasions, and that there was sufficient evidence of both adultery and indignities to justify the granting of a decree. The court below agreed with the master, setting forth its reasons in a carefully prepared opinion. From the court's decree granting the divorce, the defendant took this appeal.

Of course, the defendant and the co-respondent denied their guilt, and the question before us is primarily the credibility of the evidence presented by the plaintiff, and its sufficiency to entitle the plaintiff to a divorce.

It is incumbent upon us to examine the testimony in divorce cases heard without a jury and to determine therefrom, independently of the finding of the master or the court below, whether in truth and in fact a legal cause of divorce has been made out. *Boyer v. Boyer,* 183 Pa. Superior Ct. 260, 263, 130 A. 2d 265 (1957); *Phipps v. Phipps,* 368 Pa. 291, 297, 81 A. 2d 523 (1951). The master's report, although advisory only, is to be given the fullest consideration as regards the credibility of witnesses whom he has seen and heard, and in this respect his report should not be lightly disregarded. *Green v. Green,* 182 Pa. Superior Ct. 287, 289, 290, 126 A. 2d 477 (1956). For an excellent opinion by Judge RENO on the determination of credibility in divorce cases see *Smith v. Smith,* 157 Pa. Superior Ct. 582, 583, 585, 43 A. 2d 371 (1945). "The conclusion," it has been said, "will depend upon a judgment or intuition more subtle than can be objectively demonstrated." *Briggs v. Briggs,* 145 Pa. Superior Ct. 460, 463, 21 A. 2d 415 (1941).

The master, in a report that set forth exceptionally well his findings and his reasons therefor, believed the plaintiff and his witnesses. "The plaintiff," the master reported, "appeared to be a calm, forthright person, who freely admitted his own weaknesses and gave an honest and forthright account of his personal experiences with the defendant. He did not unduly elaborate on any area of his testimony and impresses the Master with his reluctance to admit any facts of which he was not certain . . . . On the contrary, Mrs. Shoemaker, was a well-composed individual and impressed the Master as a person of well above average intelligence. Her testimony was evasive, and in many instances, she was more than reluctant to give a direct answer to questions on cross examination."

The court below also believed the testimony of the plaintiff and his witnesses. Our independent examination of the record leads us to the same conclusion. The evidence of the defendant's misconduct is overwhelming and her defenses feeble and incredible.

She admitted having committed adultery. But, a confession of adultery unless corroborated by other evidence will not justify a divorce on that ground. *Gilham v. Gilham,* 177 Pa. Superior Ct. 328, 331, 110 A. 2d 915 (1955). "It is a rule of policy . . . not to found a sentence of divorce on confession alone," said Chief Justice GIBSON in the famous case of *Matchin v. Matchin,* 6 Pa. 332, 337 (1847). This rule was derived from the canon law, and arose from the suspicion that the confession might be extorted, or made collusively in order to furnish means to effect a divorce. II Kent's Commentaries 98. The frailty of human nature which prompts a false confession for the purpose of arousing the jealousy or ire of the other party to the marital state, is given as another, and probably more logical, reason for the rule. *Randolph v. Randolph,* 59 Pa. Superior Ct. 377, 378 (1915). Although this rule has

been subject to criticism, it has been recognized as the law of this Commonwealth since it was stated by Chief Justice GIBSON in the *Matchin* case. See Freedman, Law of Marriage and Divorce in Pennsylvania (2nd Edition) §202; *Morse v. Morse*, 81 Pa. Superior Ct. 602 (1923). Evidence of a confession is not considered to be corroborated by the repeating of the confession to another person or by the confession of another offense. *Gilham v. Gilham*, supra.

When the rule was stated in *Matchin v. Matchin*, supra, Chief Justice GIBSON immediately noted that where a confession "is full, confidential, reluctant, free from suspicion of collusion, and corroborated by circumstances, it is ranked with the safest proofs." Of course, it is not necessary to prove the adultery independent of the confession, for then the finding of adultery would stand not on the confession but upon those independent circumstances. Evidence far short of proving adultery is sufficient to corroborate the confession. *State v. Guild*, 10 N. J. Law 163; 18 Am. Dec. 404 (1828). The confession is corroborated when there is evidence which adds weight or credibility to the confession by establishing additional and confirming facts. To corroborate means to strengthen, to make more certain, to add weight or credibility. *State v. Case*, 116 S.E. 2d 429, 433, 253 N.C. 130 (1960); *Streader v. Streader*, 87 A. 2d 338, 340, 18 N. J. Super. 433 (1952); *Martin v. Martin*, 184 S.E. 220, 223, 166 Va. 109 (1936); *Rogers v. Rogers*, 104 A. 32, 89 N.J. Eq. 1 (1918).

The record in this case is filled with evidence which adds weight or credibility to the confessions. The defendant admitted having intercourse with the co-respondent in Washington, D. C. on April 23, 1960. This confession is corroborated by the undisputed evidence that they were in Washington together that day, and that the defendant sent a card to Mrs. Penny, her nurse, saying that they would attend mass in Washing-

ton the next day. (Mrs. Penny and the co-respondent were Catholic, but the defendant was not.) The defendant admitted that she had intercourse with the co-respondent at the apartments of two of her friends, the Fallers and the Bukowskys. There was corroborating evidence that she had a key to the Fallers' apartment, and that she went to both the apartments with the co-respondent, and that on one occasion she came into her home alone at 3 o'clock in the morning, when she told her nurse about having had intercourse with the co-respondent. She said she had intercourse with the co-respondent at the Ardmore Animal Hospital in his room. There was corroborating testimony that she was alone with the co-respondent in the room in which he slept, that she danced with him there, and that on one occasion she was told by the wife of the owner of the hospital to leave the co-respondent's room. The defendant admitted having intercourse with the co-respondent at her home the night of February 27-28, 1960, telling her nurse "what fun they had having a bath together and having intercourse." This confession was corroborated by evidence that when the nurse arrived at the Shoemaker home after midnight the defendant and co-respondent were alone in the house.

In addition to the corroboration relating to each specific confession, there was an almost unlimited number of instances which added weight to the confessions and constituted corroboration. The plaintiff discovered the defendant and Vymetal embracing and kissing.[1] The defendant and co-respondent went horseback

---

[1] This sentence was taken from the opinion of the court below, which appellant says was taken out of context. Appellant says: "The facts are that the occasion was a going away party for the plaintiff, defendant and her aunt . . . Dr. Vymetal [took the Shoemakers to New York]. Other friends met on the boat and brought champagne to celebrate the occasion . . . . All doors were open and there was no privacy. The kiss was a farewell kiss and there is

riding together, took trips together, went to dances together, went to the movies together, dined together, visited each other's living quarters, shopped together, held numerous long telephone conversations and looked for an apartment together.

There can seldom be direct evidence of adultery as it is almost always committed in secret, but it can be proved by circumstances which would lead the guarded discretion of a reasonable and just man to a conclusion of guilt. *Rech v. Rech*, 176 Pa. Superior Ct. 401, 410, 107 A. 2d 601 (1954).

There is not the slightest doubt that the defendant was madly in love with the co-respondent, and that she left her husband so she could continue her association with him with greater ease. Her confessions corroborated by all the above circumstances are "ranked with the safest of proofs." *Matchin v. Matchin*, supra, 6 Pa. 332, 338 (1847).

Mrs. Beatrice L. Penny, a 64 year old registered nurse, who has died since the hearing, testified concerning the defendant's confessions of adultery with the co-respondent. Mrs. Penny had nursed both Mr. & Mrs. Shoemaker during their numerous visits to the Institute of Pennsylvania Hospital in Philadelphia for psychiatric treatment,[2] and went to the Shoemaker home

---

no evidence who kissed whom." The evidence shows, however, that when the all-shore gong went off and the plaintiff and all the other people had left the Shoemaker cabin, the plaintiff noticed that his wife and Vymetal were not with the group as they went down the hall and he went back to the cabin. The plaintiff testified that "with the cabin there was a little trunkroom, and I found them in a very intimate embrace," and when the plaintiff got very angry and told Vymetal to stop the defendant said, "I don't give a damn," and when the plaintiff talked to her about it later on the ship, she said she wanted a divorce to marry Frank; that he was a he man, her ideal, and that she loved him.

[2] Mr. Shoemaker was a patient in the institution 32 times and Mrs. Shoemaker 18 times.

with the defendant when she was discharged from the institution in July 1959. While at the Shoemaker home she slept in the same room with Mrs. Shoemaker. The appellant attacks the credibility of Mrs. Penny's testimony by pointing to a few inconsistencies, some evident assumptions to which she testified and to certain inaccuracies. (She speculated that the defendant and co-respondent "probably" went to New Jersey to dance, and erroneously said the Bukowsky apartment was at 43rd & Spruce Streets, Philadelphia, when in fact it was located at 313 S. 41st Street.) We have examined her testimony carefully, and we are convinced that it is credible. The master characterized her as quiet, unassuming and candid. There was no good reason for her to commit perjury. Her testimony is corroborated by the defendant and the co-respondent up to the point where it would be fatal to the defendant's case to admit more. Where their testimony differs, it is the nurse's testimony, and not the defendant's story, that fits into the whole picture which the evidence of the other witnesses and the defendant herself so clearly unfolds.

The divorce was properly granted on the ground of adultery.

We shall deal only briefly with the charge of indignities. A wife's affair with another man in itself constitutes an indignity to the husband affording a ground for divorce. *Boyer v. Boyer,* supra, 183 Pa. Superior Ct. 260, 265, 130 A. 2d 265 (1957); *Phipps v. Phipps,* supra, 368 Pa. 291, 81 A. 2d 523 (1951); *Blansett v. Blansett,* 162 Pa. Superior Ct. 45, 48, 56 A. 2d 341 (1948). This is true even when the evidence is insufficient to support the charge of adultery. *Wick v. Wick,* 352 Pa. 25, 42 A. 2d 76 (1945); *Lowe v. Lowe,* 148 Pa. Superior Ct. 439, 25 A. 2d 781 (1942).

We have referred to many instances of indignities by the defendant against the plaintiff in our above dis-

cussion of the adultery charge. There were many more. After the plaintiff stopped drinking, his wife continued to drink an average of three fifth-gallon bottles of wine a week. On one occasion she offered to fix him a drink saying, "This will cure a lot of your worries, you should take a drink." Of course, it would not ordinarily be an indignity for a wife to offer her husband a drink, but in the light of the plaintiff's long history of alcoholism and the brave battle he was then waging to overcome the habit, this tantalizing offer was indeed an indignity.

For months the plaintiff pled with his wife to give up her lover. He tried to force Vymetal to keep away from his wife. He threatened to keep Vymetal from obtaining his citizenship papers if he would not stay away from his wife, whereupon his wife would threaten to kill the plaintiff if he kept Vymetal from becoming a citizen. Once the plaintiff persuaded Vymetal to call Mrs. Shoemaker and say he would not see her again. This produced an emotional explosion by the defendant, but did not keep the two apart.

Finally the defendant answered her husband's plea for her to give up Vymetal by saying, "I love him; I am going to see him when I want to, and there is nothing you can do about it." This demonstrated that love and affection for her husband had been replaced by hatred and estrangement. See *Boyer v. Boyer,* supra, 183 Pa. Superior Ct. 260, 271, 130 A. 2d 265 (1957); *Trimbur v. Trimbur,* 171 Pa. Superior Ct. 541, 546, 91 A. 2d 307 (1952).

The appellant argues that her husband is not an innocent spouse as is required by §10 of the Act of May 2, 1929, P.L. 1237, 23 P.S. §10. To be entitled to a divorce a plaintiff must be "innocent" as well as "injured". This does not mean that the libellant must be wholly free from all fault, but it does mean that where both parties are nearly equally at fault, so that

neither can clearly be said to be "the injured and innocent spouse," the law will grant a divorce to neither. *Daly v. Daly,* 137 Pa. Superior Ct. 403, 405, 9 A. 2d 192 (1939). This rule cannot work to the advantage of a defendant guilty of adultery against a plaintiff who is comparatively speaking free from fault. *Newman v. Newman,* 170 Pa. Superior Ct. 238, 245, 85 A. 2d 613 (1952); *Cunningham v. Cunningham,* 171 Pa. Superior Ct. 577, 581, 91 A. 2d 301 (1952).

Mere drunkeness, no matter how excessive, is not an indignity. *Mason v. Mason,* 131 Pa. 161, 164, 18 A. 1021 (1890); *Egolf v. Egolf,* 53 Pa. Superior Ct. 254, 256 (1913). On the other hand, indignities are not excused because committed while the person is intoxicated or because the indignities were caused by intoxication. *Cowher v. Cowher,* 172 Pa. Superior Ct. 98, 101, 91 A. 2d 304 (1952); *Carter v. Carter,* 166 Pa. Superior Ct. 499, 502, 72 A. 2d 621 (1950).

We cannot say that the defendant suffered no indignities from the plaintiff prior to the time he stopped drinking in 1957. Since that time there is no evidence of indignities by the plaintiff. The defendant complains that he took Miltown, a tranquilizing drug, which made him sleepy and moody and caused him to stagger, and that the parties were "incompatible" after he stopped drinking.

The question naturally arises whether indignities produced by the plaintiff's excessive use of alcohol prior to 1957, would prevent his obtaining a divorce for the gross misconduct of his wife which started two years later. It is evident, we think, that indignities which have been endured by a spouse and have clearly and definitely ceased do not permit that spouse to thereafter commit adultery or indignities with immunity. The evidence of indignities by the plaintiff prior to 1957 is hardly sufficient to establish hate and estrangement, but assuming that it is, we are satisfied

that under the circumstances of this case the plaintiff's conduct would not prevent his obtaining the divorce.

Decree affirmed.