## Miller v. Miller

*Nanovic & McKinley*, for plaintiff.

*Thomas S. McCready*, for defendant.

HEIMBACH, P. J., January 27, 1972.—The complaint in this divorce case charges husband-defendant with acts alleged to constitute indignities to the person.

The master has recommended a decree in divorce be granted. We now act on the exceptions filed to such recommendation and to his report generally. Although we are to give the master's report the fullest consideration (Golden v. Golden, 134 Pa. Superior Ct. 211, 3 A.2d 941), we are, nevertheless, obligated to make independent investigation of evidence to learn whether evidence established legal cause for divorce (Sarbiewski v. Sarbiewski, 127 Pa. Superior Ct. 463, 193 Atl. 91), and may accept or disregard his opinion: Brown v. Brown, 121 Pa. Superior Ct. 74, 183 Atl. 90.

We have carefully reviewed the testimony. Summarized, plaintiff's testimony is this:

They were married in 1949 and, for the most part, their marriage was a happy one until 1963, when defendant, as a result of a chronic lung illness, aggravated by work conditions, quit his foundry job under advice of his physician. He remained unemployed for a year or a year and a half. Plaintiff was obliged to work to support the family from such time until she left plaintiff in 1969, and at the same time do the housework and raise five children. She was employed on the night shift and, because of defendant's constant nagging and demands, she was unable to rest properly. In addition, defendant accepted no responsibility and everything to be done rested on her shoulders. Defendant, although able to work after quitting his job, failed to do so, and remained idle for a longer period of time than was necessary. He quit several jobs because he didn't like the work or the people he worked with. Finally, and several years before she left, he was employed by the State Highway. He constantly complained about the job and the people he worked with and constantly threatened to quit. He likewise constantly complained of his condition that required him to take pills for his nerves. At times, he threatened to

empty the pill bottle. He constantly, in the presence of the children, at least once a week, cursed her, calling her all kinds of vulgar names and accused her of running around. He related intimate marital activities to his mother and father, as well as to his doctor and preacher. On one occasion, he beat her and left her shoulder and arm black and blue. For two and one-half years before she left, they did not have any sexual realtions. This course of conduct on defendant's part caused her to lose any affection she ever had for him and were the reasons for her leaving plaintiff.

Defendant categorically denied that he had ever shown plaintiff anything other than love and affection, which she rejected. He denied having cursed her or that he struck her on any occasion, or that he ever accused her of running around with other men. He admitted that he had been told so by others, including his parents, his doctor and his minister, and did ask plaintiff if these rumors were true. She answered, "so what if it was true." He admitted having solicited the help of the doctor and minister in his marital difficulties. He denied relating any marital intimacies to any one. He likewise admitted that he complained frequently about his job and fellow workers to plaintiff, and she at the same time complained to him about her job, which led to heated arguments. He denied making any suicide threats, but admitted he was under the care of his doctor because of his nervous condition, aggravated by the many unexplained absences of plaintiff from their home for days at a time, as well as his distaste for his work.

Defendant appeared at the hearing without an attorney and after plaintiff had testified. We ordered a further hearing for reasons brought to our attention. At such hearing, defendant was represented by counsel. Plaintiff on cross-examination varied her prior testi-

mony by admitting that defendant had worked steadily from 1949 to 1963, and was ill the year he was out of work, and was gainfully employed for the most part thereafter. She likewise admitted that the "intimacies" that were related to his parents, as told to her by others, were that they were not sleeping together. She likewise admitted that she knew a Mr. Lechner, whom she had seen on a number of occasions prior to her leaving her home in July of 1969. Her testimony concerning their relationship is quite damaging to her case. Admittedly, she saw Mr. Lechner at various times, beginning late 1968, in her home on several occasions, as well as in Reading and in Hazleton, and on occasions in 1969, after she left her husband, but denied their meetings were for any other reason than sociability, summing it up in this fashion:

"I never really went out with Fred Lechner . . . I don't know what you call out. I might have had a sociable drink and a dinner, or something."

Three of the parties' five children* appeared as witnesses. The testimony of one of them, Cathy Zacharias, aged 21, is this: Her parents had not gotten along too well for a number of years, but the situation became unbearable one and a half to two years before plaintiff left the common home. Defendant's affirmation of his love and affection for plaintiff were totally rejected by plaintiff, which led to many arguments. Several months before her mother left, plaintiff told her about Fred Lechner, and she knew her mother was going out with him and had stayed together in Genetti's Motel early in 1969, the night of her brother's prom, when Fred had given her brother his car. Her mother later showed her pictures of Fred, her brother and his

---

* Two of the five children continue to reside with defendant. The remaining three are emancipated.

fiancee, and her mother in the motel room. She likewise saw pictures of her mother and Fred and his son taken at the shore, and that she was aware that her mother was with Fred weekends, when she told defendant she was with the girls. She stated her father was suspicious and at various times called plaintiff at work and other places to check up on her whereabouts. She likewise testified that her father was a very good father, in the following words:

"Q. Was he a good father to the children?

"A. Yes, he was a very good father.

"Q. What did he do in the home for your mother?

"A. Well, he watched the kids when she wanted to go out, uh . . . as to anything else specific, I can't think of anything else specific right now, but I knew he was a very good father.

"Q. Did he help around the home?

"A. Yes, he tried to keep himself busy. He had a live bait business . . . he sold minnows. We have a large dam in back of our house. I would like to say that all the years that he was married, and all the years that he's been our father, he worked very hard at our home . . . that we have now . . . for about fifteen years or seventeen years, I don't know exactly how, but he never asked for money for himself, he always gave the money to my mother. He always gave us everything we wanted . . . we always had what we wanted, and he bought barely anything but the bare essentials for himself. Uh . . . he would wear a pair of shoes for seven years . . .

"Q. After your mother left, did your father take care of you, Joann, and the other two children, until you finally went out on your own?

"A. Yes."

Likewise she testified she visited her mother in Fred's home in Reading and saw her graduation picture in the bedroom.

Their son Edward, who is in the Marine Corps, testified that his parents chiefly argued about their respective work, that neither of them liked their employment. On the matter of cursing, this was his testimony:

"Q. Yes, during these arguments, Ed, was there a lot of swearing going on?

"A. No.

"Q. From your recollection, was there any swearing going on between your mother and father?

"A. Not really swearing, I mean it just came like uh . . . every-day swearing, nothing really bad, you know.

"Q. Nothing real bad?

"A. Right.

"Q. And would this swearing come from both your father and your mother?

"A. Right.

"Q. To the best of your recollection, were all the members of your family, that would be you, Joann, Cathy, and the other two children, present during some of these arguments?

"A. Some of them, but very few of them . . . I mean, we just heard a couple of them. I can hardly remember them . . . how they all went.

"Q. All right, in other words, these arguments were nothing then, that really made much of an impression, or an effect upon you? Would this be so?

"A. That's right . . . they were just a regular argument."

He likewise stated he had seen his mother and Fred together before the separation and had used Fred's car the night of the prom in May of 1969. He likewise stated, contrary to the testimony of plaintiff, that he never saw his father strike his mother, but on a couple of occasions he had to restrain him when he threatened to take an overdose of pills.

Joann, 16 years of age, testified she had a baby and

in September of 1969 she left her father's home and went to live with her mother, plaintiff, in Fred Lechner's home. She likewise testified that their arguments involved their work and each complained to the other because neither liked the work they were doing. She heard swearing by both of them. She likewise testified she was aware of her mother going out with Fred before the separation.

Obviously, the parties are completely incompatible now and have been from the time defendant left his employment in 1963. It is understandable, in view of defendant's physical and mental condition, that plaintiff's action in rejecting his protestations of love and affection, constantly complaining about being forced to work, being absent from the home for days at a time without explanation, responsible for the rumors that came to defendant's ears that she was running around, refusal to have any sex relations with him, substantially contributed to defendant's nervousness and the resulting arguments and cursing by both of them.

There can be no doubt that defendant was a difficult person to live with, primarily because of his physical and mental condition. He was not physically well and was extremely nervous, and under constant medication for such condition. Several years before the separation, he was a patient at the Allentown State Hospital suffering from a nervous breakdown. The following testimony indicates his recovery has not been completely effected. In speaking about their difficulties, he said this:

"But I would say this started two years ago. It seems like the closest ones to me can hurt me the most, you know, inside of my body. It is hard to explain, but the closest one to me is like my family, Joe and my children first, and then my parents, you know, and on down, my closest friends and everything else. They

can hurt me by just saying the wrong thing, and I guess it was a year ago, a year and a half ago, Joe said, 'Let's face it,' she said, 'I just don't love you any more and I can't live like this, I don't want to live any more like this here, I am not going to work for the rest of my life, and I want a divorce,' just like that. And I just didn't know what to do, so I just threw something on my foot and smashed my foot, just trying to take the pain out of my body, you know. I said, 'Dear God, will you please stop it.' Then it blew over and then she would go to work, and I would be over there with the children and I told her, 'Let's go someplace with the kids on a week-end, you know,' and she would say, 'If you want to go some place, go yourself,' and she would never go out with us."

Even if we accepted as credible all of the testimony of plaintiff, which in fact, we do not, plaintiff would not have made out a case of indignities. We are convinced, and so find, that the conditions complained of and charged as indignities by plaintiff were brought about by defendant's illness. What the court said in Braun v. Braun, 186 Pa. Superior Ct. 260, at page 266, is controlling:

"The applicable principles are, without question, settled law. A plaintiff who seeks to sever a marital bond on the ground of indignities has the burden of proving a volitional course of conduct which renders his condition intolerable and life burdensome . . . 'In order that a divorce may be granted on the ground of indignities it must ordinarily appear that defendant has indicated, by a course of conduct, a settled hate and estrangement . . . An essential element is the intentional conduct indicative of this attitude. Consequently, where a wife's acts stem from mental illness the intent and malice are lacking, and such conduct will not support the granting of a divorce. . . ". . .

conduct which springs from mental ill-health, whatever its nature or severity, should be regarded as unintentional and lacking the spirit of hate, estrangement, and malevolence, which is the heart of the charge of indignities" '. Unusual conduct resulting from illness is not ground for divorce. . . Indignities committed by a wife are excused to the extent that her conduct is involuntarily induced by her physical condition. . .
In Castner v. Castner, 159 Pa. Superior Ct. 387, 48 A. 2d 117, we recognized that a husband was not entitled to a divorce upon indignities where the wife 'was suffering from a severe nervous condition' [less than insanity] and for that reason was 'unstable and irresponsible for her conduct' . . . In the application of these principles to the testimony in this case, the plaintiff clearly has failed to meet his burden of proof."

Plaintiff has not, in any event, sustained the burden of proving indignities sufficient to warrant the granting of a divorce. An unhappy marital existence, characterized by frequent quarrelling and bickering, standing alone, does not warrant the granting of a divorce on the grounds of indignities": Boyles v. Boyles, 179 Pa. Superior Ct. 184, 189, 116 A. 2d 248, 250. Moreover, since plaintiff was at least equally at fault in creating this dissension, she would not be entitled to a divorce even if such indignities had been proved: Goshorn v. Goshorn, 163 Pa. Superior Ct. 621, 63 A.2d 135, 136. Benny v. Benny, 167 Pa. Superior Ct. 227, 231, 74 A.2d 782, 784.

Plaintiff's extra-marital activities before their separation constitutes an indignity to defendant and affords him grounds for a divorce: Shoemaker v. Shoemaker, 199 Pa. Superior Ct. 61 (1962), 184 A.2d 282; Kramer v. Kramer, 194 Pa. Superior Ct. 538, 168 A.2d 624. Such being so, we cannot find that plaintiff is the injured and innocent spouse.

To be entitled to a divorce, plaintiff must be innocent as well as injured: Shoemaker v. Shoemaker, supra. Injury and innocence of plaintiff must clearly appear from the evidence: Kramer v. Kramer, supra.

Evidence of what occurred after separation in an action for divorce on the grounds of indignities is relevant to show conditions existing while parties lived together, and particularly where questioned relationship involves same person before and after separation: Kramer v. Kramer, supra.

Wherefore, the exceptions filed to the master's report and recommendation are sustained, and we enter the following

### ORDER

Now, January 27, 1972, plaintiff's complaint in divorce is dismissed.

Costs on plaintiff.