DiFabio *v.* DiFabio, Appellant.

Argued December 12, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Amos Davis,* with him *Gordon E. Stroup,* for appellant.

*Paul A. Koontz,* for appellee.

OPINION BY WATKINS, J., March 20, 1963:

This is an appeal from the decree of the Court of Common Pleas of Bedford County, Pennsylvania, granting a divorce a.v.m., to the plaintiff-appellee, Fulvio DiFabio, from the defendant-appellant, Elaine DiFabio, on the grounds of adultery and indignities to the person.

We have carefully studied this record and have come to the conclusion that the decree should be affirmed and in doing so we are adopting much of the very able opinion of the court below. We agree that, "Although the testimony is most contradictory and the appearance, demeanor, temperament and personality of the witnesses as they appeared on the stand are of great importance in determining their credibility, we deem it the duty of the Court to make its own independent and careful investigation of the evidence, and its own findings and conclusions, keeping in mind the report of the Master as representing the view of an impartial representative of the Court who saw and heard the witnesses."

The master recommended a divorce on both grounds and an examination of his report discloses a careful and detailed study and discussion of the evidence. His disposal of credibility in favor of the plaintiff was made after a careful analysis based on his observation of their attitudes, wherein a high degree of bitterness and passion was displayed. What we said in *Bailey v.*

*Bailey,* 199 Pa. Superior Ct. 534, 185 A. 2d 632 (1962), at page 536, is equally applicable here: "The master who saw and heard the witnesses gave a detailed report recommending the divorce and made a careful and painstaking analysis of all the testimony and after deciding the issue of credibility against the defendant, found that the grounds establishing indignities were amply proven. The court below said, 'We believe we are justified in giving the fullest consideration to the report of the master since he saw and heard the witnesses and we concur with his findings as to credibility'. After a careful study of this record, including the master's report, and the opinion of the court below, we concur with his conclusion as to credibility."

President Judge SNYDER, sets forth the facts that are not in dispute:

"The plaintiff and defendant first met in the year 1945. Neither had been married. The defendant was the mother of a three year old son, named Larry Smith. Within the next five years, the defendant became the mother of a son named John DiFabio and a daughter named Madelina DiFabio. The plaintiff admitted paternity of these two children and provided the defendant and the children with an apartment, groceries and clothing. The parties were married on November 11, 1950, and moved into an apartment with the two children. At that time the plaintiff was 58 years of age, was a partner in a produce and beer distributing business and was a member of the Catholic Church. The defendant was 32 years of age, was or had been a waitress, and was a member of a religious group known as Jehovah's Witnesses. The defendant spent five hours a day, three days a week in church duties, which included distribution of literature and house visitations in this and other communities and in church attendance. She took her children with her on most of her calls on behalf of the church. She gave up her employ-

ment as a waitress at the time of her marriage. She cooked most of the family meals. The plaintiff is a good cook and specialized in Italian dishes. He spent all of his time with his business affairs. He and his wife rarely went anywhere together and, in fact, had little in common except their children. He owned a car but could not operate it. His wife drove the car on frequent trips to Altoona and nearby communities and was accustomed to driving around the streets of Bedford late at night, usually accompanied by another woman. There were constant arguments and name calling by and between the parties, in the home and at the place of business, in front of their children, employees and others.

"On or about February 27, 1961, plaintiff went to the Johns Hopkins Hospital at Baltimore for the removal of a cataract from his eye and remained there until March 10, 1961, when he returned home. Prior to going to the hospital the plaintiff became suspicious of the conduct of his wife and hired one or more detectives to investigate her activities. He became dissatisfied with their services and discharged them not long thereafter. Sometime after his return from the hospital he heard rumors that his wife was running around with other men. On May 20, 1961, Dale Fickes admitted to the plaintiff that he committed adultery with the plaintiff's wife on March 6, 1961, and the plaintiff immediately instituted this action in divorce and moved from the common domicile. The plaintiff and defendant have not cohabited since that time, to wit, May 20, 1961.

"The Complaint and Bill of Particulars allege that the defendant committed adultery with an unknown person about 1:00 a.m. on March 2, 1961, in an alley at the rear of the apartment and near the business establishment of the plaintiff; that she entertained an unknown man in her apartment after midnight on

March 3, 1961; that she committed adultery with Dale Fickes on March 6, 1961; that she committed adultery with an unknown man during the last week of March or the first week of April, 1961, at a place near the Bedford Springs; at about 11:30 p.m. on a night in the first week of April, 1961, she was parked in the rear seat of a car with an unknown man at the Arandale Golf Course. The defendant denied each and every averment of adultery."

We cannot improve either upon the review of the testimony concerning adultery as given by the wife and the husband's chief witness, Dale Fickes, and the conclusions drawn therefrom:

"We will first review the testimony relative to the alleged adultery on March 6, 1961, for the reason that it is the most serious of the various charges. Dale Fickes, testifying on behalf of the plaintiff, stated that he is 22 years of age and is married to Darlene Fickes, a second cousin of the defendant; he and his wife on March 6 were living in an apartment near West Pitt Street in Bedford Borough; that during that evening, after drinking five or six bottles of beer he sat on a park bench near the defendant's apartment; that between 11:30 and 12:00 the defendant arrived in a car and sat down beside him and talked with him for several minutes after which she invited him to her apartment for a bottle of beer; that after he drank 2 or 3 bottles of beer he heard the fire siren and he and the defendant decided to go to the scene of the fire. They got in the defendant's car and she drove him to the scene and then asked him if he wanted to go for a ride; he stated that he did and she drove him to his apartment where he got some money and then to a gas station for gas; thereafter she drove him to a parking place several miles from Bedford where they had sexual relations; thereafter she drove him back to his apartment in Bedford.

"The defendant testified that on the night in question when she returned with a friend from a ride in the friend's car, Fickes called to her and asked her if she had a match; she sat down with him and they talked for about 20 minutes and he told her he was looking for a date; they then went to her apartment to get a match and while they were there she got him 1 bottle of beer and they sat and talked about knives and a stabbing incident in which Fickes had recently been involved; that about 12:00 or 12:30 they heard the fire alarm, went to the fire in her car and then drove to the gas station for gas. Fickes then asked her to drive him to his sister's home some 5 miles west of Bedford which she agreed to do but said she would have to hurry because it was late and her children were at home alone. After stopping at his apartment for some money she drove the car some miles west of Bedford and while she was driving Fickes placed a knife against her throat and told her he would cut her throat if she did not do what he wanted her to do. He forced her to drive to a secluded spot and stop the car after which he tried to have sexual relations with her. She refused and he tore her clothes; however, she finally succeeded in resisting him and getting him to throw away the knife; that he then got out of the car, directed her in turning the car and then they came back to Bedford. On the way back she asked him if he wanted her to take him to the home of his sister and he said he did not and she thereafter drove him to his apartment where he apologized for his attack on her and begged her not to tell the police about it. She agreed to keep it quiet and then drove to her own apartment. A few days later she told her daughter-in-law, Sherry Smith, her sons and daughter and Mrs. Forman about the attack but she did not disclose the name of her assailant until much later. She stated that sometime after her husband returned from the hospital he told her he had

been informed by one of his workmen of her affair with Fickes and that Fickes had admitted it to him. She said she told the plaintiff the truth about it and he said he believed her and loved her. She further testified that thereafter in the latter part of April she had intercourse with her husband."

The evidence in support of the charge of adultery is convincing. The seriousness of this charge requires proof that must be so clear that it leaves no other conclusion in the mind of a reasonable person. *Connor v. Connor,* 168 Pa. Superior Ct. 339, 77 A. 2d 697 (1951). True, the testimony of a corespondent, standing alone, may be looked upon with suspicion, raise serious doubts as to credibility and point to possible collusion with the husband. 1 Freedman, Law of Marriage and Divorce in Pennsylvania (2d Ed.), §203. However, it isn't necessary to prove the direct fact of adultery, if the circumstances are such as to lead the guarded discretion of a reasonable and just man to a conclusion of guilt. *Pierpoint v. Pierpoint,* 108 Pa. Superior Ct. 108, 164 A. 808 (1933); *Manley v. Manley,* 193 Pa. Superior Ct. 252, 164 A. 2d 113 (1960).

In this case, the testimony of the corespondent, concerning the circumstances of the alleged adultery, is corroborated by the defendant in practically every detail except the act itself. There was also corroborative evidence by other witnesses that placed them together in several points of their journey on the night in question. There was also testimony pointing to adulterous conduct by the defendant with the corespondent and others which bolsters the finding of adultery and indignities as causes of this divorce. The opportunity created by both the defendant and the corespondent as set forth in their testimony, reveals the existence of an adulterous inclination. *Campbell v. Campbell,* 185 Pa. Superior Ct. 474, 137 A. 2d 830 (1958). And her manner of life, particularly at night, made easy the

opportunity to satisfy that inclination. *Tuirner v. Tuirner,* 150 Pa. Superior Ct. 110, 27 A. 2d 434 (1942).

The court below discusses credibility of the principals as follows: "The credibility of Fickes and the defendant is the key question to be solved. If we believe the Fickes version of the affair, the charge of adultery is clearly established. The defendant herself corroborated much of his testimony leading up to the finale of this affair, and the fact that she left her home and children late at night, and went out with a young man who was looking for a date, supports his version of the conclusion thereof. If anything more were necessary it can be found in her own statement as to her reaction to the alleged attack, after she said it had been averted. When Fickes got out of the car to aid her in turning it, she made no attempt to flee from this man who had just threatened her life and honor. On her way home she kindly offered to drive out of her way in order that he might visit his sister. At his apartment she chatted amicably with him and promised not to tell the police. She did not complain to the police even though she passed them prior to arriving at her apartment. She says she told her children and a friend of the attack a few days later, but she did not tell her husband until he had heard about it from other sources and brought up the subject after a lapse of some weeks. We are firmly convinced by the evidence before us that the defendant committed adultery with Fickes and we so find as a fact."

As to condonation and the ground of indignities to the person we also adopt the disposition made by the court below:

"The defendant's testimony indicates that after she told the plaintiff her version of the 'truth' of the Fickes affair, he said he believed it and that he loved her, and thereafter had sexual intercourse with her. This is denied by the plaintiff. In any event, it could not amount

to a condonation by the husband. We do not accept her version of the affair. If the husband were misled by her story he could not be held to have condoned the offense as we have found it to be.

"We do not find it necessary to determine whether the testimony of other witnesses establishes other acts of adultery but it does have a bearing upon the question of indignities. The Fickes affair became a matter of common gossip which the defendant helped to spread. Her admitted excursions around the streets of Bedford late at night in her husband's car or in the car of a friend added fuel to the gossip of which she was well aware and yet made no effort to abate. This conduct unexplained lends credence to the many contemptuous, degrading and derogatory remarks allegedly made by her against her husband in the presence of her husband and family and others. It has been held that conduct by a husband with respect to other women, although not sufficient to support a charge of adultery, may be considered as a form of personal indignity to the wife, rendering her condition intolerable and life burdensome: Lowe v. Lowe, 148 Pa. Superior Ct. 439. In Blansett v. Blansett, 162 Pa. Superior Ct. 45, 48, Judge DITHRICH said: 'Respondent's course of conduct was humiliating, degrading, and so notorious as to make her husband the laughing stock of his fellow-employees. That is one thing a normal individual cannot stand for, and should not be made to stand for, no matter what indignities he may be required to endure before the stage is reached beyond which human indulgence cannot be expected to submit'."

"The record is replete with evidence of that kind of a continuous and persistent course of conduct that demonstrated that the love and affection upon which the matrimonial status rests had been permanently replaced by hatred and estrangement, constituting indignities to the person as defined by this Court in a long

line of cases. D'Alessandro v. D'Alessandro, 187 Pa. Superior Ct. 194, 144 A. 2d 445 (1958)." *Bailey v. Bailey,* supra. We have made a careful study of this record and have come to the same conclusion as the master and the court below as to credibility and are convinced that the testimony is sufficient to establish the charges of adultery and indignities to the person.

Decree affirmed.