Opinion by
 

 Montgomery, J.,
 

 In this appeal from a decree in divorce a.v.m. the wife-appellant questions the sufficiency of the evidence to establish that husband-appellee is an “innocent and injured spouse” or that she committed such indignities to his person as to render his condition intolerable arid his life burdensome.
 

 To make proper disposition of this appeal, we performed our required duty of carefully reading the entire record of the testimony, which is unnecessarily long, and have made an independent determination of the credibility of the parties and their witnesses. Although we have given the fullest consideration to the report of the master on the issue of credibility, we do not find the answer so clear as he did. Had we determined that appellee and his witnesses were entirely credible and the appellant and her witnesses entirely incredible, our problem would have been simple; we would have accepted his account of the marriage events, whole cloth, and disregarded her answers and countercharges. However, as in most cases of divorce, each party is prone to describe the events of the marriage to his or her advantage and, in doing so, exaggerate or minimize, color or embroider the truth, and even falsify. Judge Woodside of this Court, in
 
 Shoemaker v. Shoemaker,
 
 199 Pa. Superior Ct. 61, 65, 184 A. 2d 282, 284 (1962), quotes from an opinion by Judge Reno in
 
 Smith v.
 
 Smith, 157 Pa. Superior Ct. 582, 43 A. 2d 371 (1945), on the difficulties of determining credibility in these cases, that which we think bears repeating, to the effect that the conclusion on credibility “will depend upon a judgment or intuition more subtle than can be objectively demonstrated.”
 

 Although appellee appeared to be candid and straightforward to the master, his testimony was too
 
 *609
 
 general and indefinite for ns to consider it entirely credible. Furthermore, it was not corroborated in very many important particulars by his witnesses. On the other hand, although appellant was not truthful in one particular, we would not be inclined to apply the harsh rule of
 
 falsus in uno, falsus in omnibus
 
 and entirely disregard her testimony and that of her many witnesses for that reason alone.
 

 Viewing the record in this light, the truth as to the relation of these parties appears to be as follows: The parties were married December 26, 1942, in Pittsburgh, Pennsylvania, at which time the husband was 25 and the wife was 22 years of age. They purchased a house in 1943; but soon thereafter he was inducted into the United States Navy and was in the Pacific Theater from the summer of 1944 until December, 1945, when he returned home and resumed living with his wife. Shortly thereafter he discovered that she was expecting a child, admittedly not fathered by him. They separated immediately following this discovery and he filed divorce proceedings shortly thereafter. He did not continue with those proceedings ;■ but instead he became reconciled with his wife following the birth of the child on April 19, 1946, and its placement in a foster home under order of the Juvenile Court, which order placed on her the obligation for its support at $14 per week. Following their reconciliation in early 1947, they lived together in the home owned by them until February 23, 1960, when he departed from it.
 

 We fail to see in the record anything that could be considered as indignities to his person for the first ten years following their reconciliation. In his bill of particulars and in his testimony appellee made certain complaints, but they appear frivolous and unimportant in the light of the general behavior and living conditions of the parties.
 

 Both were gainfully employed during the entire time they lived together; and although he emphasized
 
 *610
 
 that fact during the divorce proceedings and stated that it was against his wishes that she work, we find nothing to indicate that during the period they lived together he took any steps to prevent her from working or refused the benefits of her labor. His other complaint in this particular was that because of her working she neglected him and the home. However, aside from the fact that this is a foreseeable result of both parties to a marriage being employed and away from home, his own testimony concerning activities in the home contradicts this statement and answers this complaint.
 

 During the first ten-year period of their married life they went out socially, visiting various clubs, where they both drank. Until 1957 appellee was a heavy drinker and appellant a moderate one. His bill of particulars states that she
 
 “occasionally
 
 drank to excess”. (Emphasis supplied) Appellant bowled one night a week in a group which included appellee’s sister. This was the basis of another of appellee’s complaints, i.e., that his wife would not return from work and that he would not see her for days. This was true, of course, since he worked the night shift from 11:00 P.M. to 7:30 A.M. and left home at 10:00 P.M., which was much earlier than the hour she returned from bowling. On the other hand, he was a fisherman and frequently went away for two or three days at a time without explanation.
 

 The working arrangements of both also interfered with their having a family. Each charges the other with not desiring a child; but we find nothing to indicate that either seriously desired children. They cohabited regularly during this period. We find no evidence of hate and estrangement to have existed.
 

 In 1957 appellee developed an ulcer which required a strict diet; and although he complains that his wife did not prepare his meals according to his diet, there
 
 *611
 
 is much evidence to indicate that he did not adhere to it. Although he curtailed his intake of intoxicants, he did not abstain entirely. The fact that he did curtail his intake made him more critical of his wife for her continued participation in the use of intoxicants; and this caused more severe arguments between them, resulting in his abuse of her physically, and her retaliation with scissors and knives, about which he complains. Both used profane and abusive language toward each other on such occasions, each provoking the other. From 1958 they ceased to engage in sexual relations, he withdrew from the common bedroom, declined to eat the meals she prepared, and at times they did not speak to one another.
 

 Although all during the prior years appellee gave indications of jealousy, and many of their altercations were due to her refusal to explain completely her absences, it was not until February 20, 1960, that there appears to have been any cause for his suspicions.
 

 The lower court predicated its decree entirely on the association of appellant with a man, William Gawryk. Judge Price said in his opinion, “It is particularly clear that this defendant, although forgiven by plaintiff for an early indiscretion, never really mended her ways, and certainly the Gawryk matter is a classic example of her unconcern for plaintiff and her marriage.”
 

 The master had recommended the decree on the basis of the Gawryk matter as well as on the basis of the other matters heretofore referred to and rejected by us. He said, “The Defendant’s conduct with regard to Plaintiff [’s] desire that she leave her employment and her reaction to any mention of the child was contemptuous and constituted an indignity to the Plaintiff. Her unexplained prolonged absence from home constituted an indignity. Her conduct with respect to another man, although not sufficient to support a
 
 *612
 
 charge of adultery may be considered as an indignity to the Plaintiff.”
 

 The association with a person of the opposite sex, other than his or her spouse, may be considered as evidence of indignities.
 
 DiFabio v. DiFabio,
 
 200 Pa. Superior Ct. 381, 188 A. 2d 838 (1963);
 
 Lowe v. Lowe,
 
 148 Pa. Superior Ct. 439, 25 A. 2d 781 (1942). However, the extent and nature of the association must be considered. The existing rule in such cases is that the mere existence of affection for a third person, which arouses the jealousy of the libelant, does not constitute indignities to the libelant; but the open exhibition by respondent of that affection may constitute indignities to the person if sufficiently serious to bring upon the spouse continued shame, humiliation and disgrace. There must be an open and notorious exhibition of improperly placed affection.
 
 Harding v. Harding,
 
 156 Pa. Superior Ct. 438, 40 A. 2d 869 (1945).
 

 Except for the “Gawryk affair” the only evidence concerning appellant’s association with another man prior to the separation was given by appellee. He testified that on February 20, 1960, he left for work shortly before 10:00 P.M. but returned shortly thereafter to find his wife fully dressed, standing in the doorway of their home talking to a man. She had been dressed in a housecoat prior to his departure. As he approached the door, his wife went indoors and the man ran to his car. After demanding to know who the man was and being told that he was selling raffle tickets, appellee left again but waited near the house to see what would occur. Shortly thereafter he saw his wife go behind the house and get into the car with the man. He followed them in his car but lost them in traffic. He separated on February 23, 1960, and filed this suit in divorce on February 24, 1960. Prior to this time he knew nothing about William Gawryk.
 

 
 *613
 
 This separation did not resolve the differences ■ between the parties. Appellee thereafter, forced his way. into their home, still occupied by his wife, requiring the presence of police and constables on several occasions, and resulting in his arrest several times and the posting of a surety of the peace bond. Later he intruded on and disturbed a party she was having in her home for her bowling group. In addition, he followed her and on one of these occasions, July 31, 1961, saw her enter a tavern alone at about 10:0'0 P.M; but come out of it about midnight with a man. However, they separated when, he alleges, they saw him. The man réturned to the tavern and appellant ran up the street to a girl friend’s home. After she returned to her car later that night alone, he continued to follow her, and to avoid him she went into the Avalon Police Station to seek help, and there called her lawyer. She denied she had been in the tavern and contended she had been in the girl friend’s home to which she ran again when she saw her husband. He admitted her girl friendas home was nearby.
 

 Appellee submitted certain photographs, taken in July, 1959, showing the presence-of a man he did not know in his home. The scenes indicate the presence of other persons, including other women, in what appears to have been a gathering for party purposes. However, appellant is not shown in any display of affection. These pictures had been found by him in the home prior to his departure and were openly displayed there. They were later explained to have been pictures: taken at a bridge shower for a friend of appellant.
 

 Following the close -of appellee’s case, and near the end of appellant’s case, appellee asked leave of the master to submit additional testimony of witnesses-that he was unaware of until August 10, 1962. • These witnesses' were Mrs. William Gaw'ryk and her children. Mrs. Gawryk had been separated from her husband for.
 
 *614
 
 five years, since 1957. The substance of the testimony given by these witnesses was that from 1959, appellant, in company with Mr. Gawryk, once visited a Gawryk child who was ill in the Children’s Hospital; at another time at the Heart House in Valencia; and that at another time they were together when Mr. Gawryk came to see his children on a visitation allowed him under separation arrangements; that Mr. Gawryk, his children, and appellant made two trips to Detroit to see the family of Mr. Gawryk who were friends of appellant; that they made other trips together, one to Burgettstown, West Virginia, one to Ligonier, and one to a picnic at Kennywood Park. The children were always along on these occasions. However, there is no evidence of any demonstration of affection between Mr; Gawryk and appellant unless it can be gained through the exclamation of appellant of “Oh Bill!” on Mr. Gawryk’s entrance into the room at the time of the last hearing before the master, which we do not interpret it to be, although some recognition of this incident was given by the master and Judge Price.
 

 All of these facts with respect to appellant’s association with Mr. William Gawryk were reluctantly admitted by her. However, she gave seemingly reasonable explanations, from which an inference could be drawn that her professed love of children had partly motivated the association. She explained that she had originally met Mr. William Gawryk at his parents’ home in McKees Rocks through her friends, Mr. Joseph Gawryk, a brother of William, and Mrs. Helen Gawryk, Joseph’s wife. She had visited the Gawryk child in the hospital at the request of Mrs. Helen Gawryk, whose home was in Royal Oak, Michigan. On the occasion when she allegedly was seen alone at Kenny-wood in 1960 with William Gawryk, she explained that she had gone there with friends and her meeting him was by chance, which was
 
 corroborated
 
 by a wit
 
 *615
 
 ness, Mrs. Loretta Eogers. Mrs. Lapiska did not admit to nor did any of tke testimony show any demonstration of affection between Mrs. Lapiska and Mr. Gawryk. Since Mr. Lapiska was unaware of the association of Mrs. Lapiska and Mr. Gawryk until August, 1962, it could not have had an effect on him. With the exception of the incident involving Mrs. Lapiska’s visit to the hospital in August of 1959 to see Billy Gawryk, all of her association with Mr. William Gawryk occurred after the divorce proceedings had been instituted. However, appellant found appellee in the company of another woman on July 2, 1960, at 7:30 A.M., coming out of an all-night club, at which time he asked appellant for a divorce.
 

 In justice to both parties we have reviewed and discussed this record in great detail. After doing so we are constrained to adopt the conclusion that the appellee has not met his burden of establishing either that he is an innocent or injured spouse or that appellant is guilty of such indignities to his person as to render his condition intolerable and his life burdensome. Her earlier transgression had been condoned; and her current indiscretions, if indiscretions they were, do not measure up to the standard previously described. Incompatibility since 1957 existed; but indignities to him have not been proved. Divorces are not granted when both parties are at fault.
 
 Simons v. Simons,
 
 196 Pa. Superior Ct. 650, 176 A. 2d 105 (1961).
 

 Decree in divorce a.v.m. vacated and complaint dismissed.
 

 Woodside, J., would affirm.