386 A.2d 129

**Carol NARBESKY, Appellant,**

v.

**Jonathan NARBESKY, Appellee.**

Superior Court of Pennsylvania.

Submitted Nov. 21, 1977.

Decided April 28, 1978.

50

Albert J. Jones, Aliquippa, for appellant.

Arthur S. Herskovitz, Aliquippa, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT, and SPAETH, JJ.

SPAETH, Judge:

■ This case arises on a husband's petition asking that his obligation to support his wife be terminated. The lower court granted the petition on the basis that the wife's "friendship" with another man constituted "indignities." This was error.

■ It is well established that the obligation of support terminates when it is shown that the conduct of the financially dependent spouse provides a ground for divorce. *Commonwealth ex rel. Young v. Young*, 213 Pa.Super. 515, 247 A.2d 659 (1968), *allocatur refused; Commonwealth ex rel. Brobst v. Brobst*, 173 Pa.Super. 171, 96 A.2d 194 (1953); *Commonwealth (ex rel., Appellant) v. Crabb*, 119 Pa.Super. 209, 180 A. 902 (1935). Here, as indicated, the lower court held that the wife's conduct did provide a ground for divorce in that it constituted "indignities." Various cases have defined "indignities" in various, and sometimes inconsistent, ways. In *Steinke v. Steinke*, 238 Pa.Super. 74, 357 A.2d 674 (1975), this writer had occasion to collect the cases, and concluded that

the "essential feature" of a charge of indignities, *Phipps v. Phipps*, 368 Pa. 291, 81 A.2d 523 (1951), cert. denied, 342 U.S. 942, 72 S.Ct. 554, 96 L.Ed. 701, is a "course of conduct" that will depend "largely upon the circumstances of each case" but that in every case must be "inconsistent with the position and relation as a spouse," *McKrell v. McKrell*, 352 Pa. 173, 42 A.2d 609 (1945), and render the condition of the injured and innocent spouse "intolerable" and his or her life "burdensome," Act of May 2, 1929, [P.L. 1237, § 10, as amended by the Act of March 19, 1943, P.L. 21, § 1], 23 P.S. § 10.

*Id.,* 238 Pa.Super. at 89, 357 A.2d at 681–82 (Concurring Opinion).

Mr. and Mrs. Narbesky separated in May 1975. They have three children who were 16, 13, and 4 years old at the time of the hearing. The allegation of indignities was based upon Mrs. Narbesky's relationship with one Ralph Gerace. Mr. Narbesky testified that he saw his wife with Mr. Gerace on two occasions; on the 4th of July, at approximately 12:00 noon, he saw his wife and Mr. Gerace "talking together down at the K–Mart down there," N.T. 7; and he once found Mr. Gerace and a repairman at his wife's house, fixing the refrigerator. Mr. Narbesky also testified that he saw Mr. Gerace's car parked at his wife's house, and her car parked at Mr. Gerace's house. N.T. 5. (He later stated that he only saw Mr. Gerace's car in the driveway on one occasion. N.T. 8.) Mr. Narbesky did not claim that these observations led to the separation (in fact they occurred after the separation), but rather stated that he and his wife had separated because they were not "getting along together too much, and we were fighting and angry all the time." N.T. 5. He admitted, however, that he had been drinking a lot, and that at those times—"maybe" twice a week—he would beat his wife. N.T. 10. He further stated that his wife admitted that Mr. Gerace visited her several times a week for 5–10 minutes, but that she said that she and Mr. Gerace were friends and that they got together because she was seeking his advice in regard to problems she was having with her son. N.T. 7–8.

The other testimony in support of the petition to terminate support was that of Mr. Narbesky's nephew and of Mrs. Gerace. The nephew testified that on two occasions he saw Mr. Gerace with Mrs. Narbesky in her car; once "she came in for gas and the other time was in front of McDonald's." N.T. 18. The nephew also testified that he saw Mrs. Narbesky on three unspecified occasions with a man whom he was not able to identify. N.T. 18. Mrs. Gerace testified that she saw her husband with Mrs. Narbesky on one occasion. She said that on Easter Sunday, at approximately 4:00 p. m., she saw Mrs. Narbesky's empty car parked in the parking lot at

"Kaufman's." Over an hour later, Mr. Gerace drove into the parking lot. In his car were Mrs. Narbesky and her daughter. N.T. 24. Mrs. Gerace also stated that "they were sitting almost on top of each other." N.T. 26.[1]

Mrs. Narbesky admitted that she had been with Mr. Gerace in Kaufman's parking lot on Easter Sunday. She explained her relationship with Mr. Gerace as follows: She first met Mr. Gerace and his daughter at weekend football games in which Mrs. Narbesky's child and Mr. Gerace's grandchildren played. When Mr. Gerace's daughter became ill, she went to her house almost every day to take care of her and her children; Mr. Gerace was also there. Some time later Mrs. Narbesky became aware that her son "had been on dope." She called Mr. Gerace, who had been a township commissioner, for advice.[2] He agreed to talk to her and said

---

1. It is evident from the record that Mrs. Gerace was distressed by her husband's friendship with Mrs. Narbesky. At one point she testified:

   Q. And did you know his wife [Mrs. Narbesky]?
   A. Yes, I did.
   Q. And did you have any discussion with her concerning her association with your husband?
   A. Yes, I did. And I even asked her if she wanted a divorce I would give it to him.
   Q. You asked your husband this?
   A. Of course he denies everything, except when I caught them together.
   N.T. 23.

   It is unclear whether her question was addressed to her husband or to Mrs. Narbesky. The issue here, however, is the impact of Mrs. Narbesky's conduct on Mr. Narbesky, not on Mrs. Gerace. Furthermore, it appears that this is not the first time that Mrs. Gerace had accused her husband.

   Q: Has your wife ever accused you of other women?
   A: [Mr. Gerace]: Being I am in politics, like anybody else, all politicians are accused of everything in this world.
   N.T. 54.

2. It is not quite clear what first led Mrs. Narbesky to call Mr. Gerace. She testified as follows:

   A. Okay. I had heard through a friend that— . . . That she had called, my girlfriend had called stating that my son had been on dope. And I was very upset with that, and I tried, and tried, and tried to get a hold of my girlfriend. And I couldn't succeed. So I called Mr. Gerace, and I was very, very upset. And I said, "What's going on? Why can't she call me? Why does she go and call a friend?" He said, "Now, just calm down. You don't know

that he had various newspaper clippings on the subject. When she drove to Kaufman's parking lot with her daughter it was to meet Mr. Gerace there to discuss the problem. (She said she did not seek her husband's advice because he had proved unhelpful in the past, and had in fact told their son that he did not have to listen to his mother.) After the meeting at Kaufman's, she continued to call Mr. Gerace for advice and he dropped by the house, sometimes several times a week, for 10–15 minutes to talk and to see how the children were. She described the incident with the refrigerator as follows:

> I had—this was in October. It was my daughter's birthday. That's the first time I saw the freezer was broken. And I tried to get a hold of a repairman and I couldn't. I even called Sears. But Sears told me they wanted $150 to fix it. They didn't look at it. This is only what they told me. And at the time I told them I didn't have the money, could I put it on charge. Well, they told me I was no longer able to use our joint charge account. So my husband had called me later that night and wanted to know what I was doing. And I told him the freezer was broken, and everything was defrosting in it. And I had to get it fixed. He said, "Well, that's your problem." So I kept on trying, and trying, and trying different repairmen. I couldn't get anybody. So I called Mr. Gerace and asked if he knew anybody. And he said, yes, he did. So he called the man and he brought the man up.
>
> N.T. 33–34.

Mrs. Narbesky denied that she and Mr. Gerace had ever been together in public other than on Easter Sunday at

> what the problem is." I said, "All I know is he is supposed to be on this stuff. Why doesn't she call and confront me. We are supposed to be friends."
> Q. Pardon me. Who are you referring to when you say "girlfriend"?
> A. Mary Ann Conley.
> Q. And why did you call Mr. Gerace concerning this problem?
> A. Because that was his daughter, and I thought he knew where she could be contacted.
> N.T. 30.

Kaufman's. (In regard to the nephew's testimony, she testified that her sixteen year old daughter has boyfriends, and drives her car. N.T. 43.) She acknowledged—stated—that she and Mr. Gerace were friends.

Mr. Gerace corroborated Mrs. Narbesky's testimony. He complained that Mr. Narbesky, and Mr. Narbesky's mother and sister were calling Mrs. Gerace and "working my wife up", and explained his continuing friendship with Mrs. Narbesky, despite his wife's and Mr. Narbesky's accusations, as follows:

> Being that she did—like I said prior, that she was very good to my daughter, helped her out when my daughter was lying in a hospital. Nobody was helping her. She took care of the children, and so forth. I appreciated it. N.T. 50.

On the basis of the above testimony that hearing judge concluded that Mrs. Narbesky's and Mr. Gerace's "relationship involved something more than mere friendship", and constituted conduct amounting to indignities. Lower court opinion at 2. The court cited no cases in support of this conclusion.

It is true that a spouse's relationship with a member of the opposite sex, other than his or her spouse, may constitute an indignity even when the evidence is insufficient to sustain a charge of adultery. *Schrock v. Schrock*, 241 Pa.Super. 53, 359 A.2d 435 (1976); *Lapiska v. Lapiska*, 202 Pa.Super. 607, 198 A.2d 386 (1964); *DiFabio v. DiFabio*, 200 Pa.Super. 381, 188 A.2d 838 (1963); *Shoemaker v. Shoemaker*, 199 Pa.Super. 61, 184 A.2d 282 (1962); *Giuffre v. Giuffre*, 187 Pa.Super. 154, 144 A.2d 477 (1958); *Olbum v. Olbum*, 183 Pa.Super. 5, 128 A.2d 125 (1956); *Macormac v. Macormac*, 159 Pa.Super. 378, 48 A.2d 136 (1946); *Wick v. Wick*, 352 Pa. 25, 42 A.2d 76 (1945); *Lowe v. Lowe*, 148 Pa.Super. 439, 25 A.2d 781 (1942). However, an examination of these cases is instructive, for it demonstrates that in fact, evidence of friendship alone is not sufficient to prove indignities; there must be additional evidence.

For example, in *Giuffre v. Giuffre, supra,* 187 Pa.Super. at 157–58, 144 A.2d at 479, the following evidence was presented in addition to the evidence of the extramarital relationship.

He engaged in numerous card games at their apartment, which were accompanied by excessive drinking and so much noise that on one occasion the wife found it necessary to call the police. Appellant showed no concern when one of his men friends attempted improper liberties with his wife's person. Appellant was frequently absent at night and, when his wife remonstrated, he told her it was his life to do with as he saw fit. He refused to permit his wife to touch the car, and kept his phonograph records under lock and key. On one occasion he shoved his wife against a doorway so that her body was bruised and her arm was bloody. On another occasion, when his wife was bathing, he turned on the hot water and inflicted such severe burns that bandages were required for several days. At a New Year's party, appellant walked out on his wife, and she was compelled to go to the house of friends for the night. Appellant's course of treatment caused the wife to remove from the common home in the summer of 1954. After living with her mother for a month and a half, upon appellant's promise to reform, she returned to live with him. Appellant then settled back into the same course of conduct as before, and the couple finally parted in July 1956.

In *Schrock v. Schrock, supra,* 241 Pa.Super. at 56, 359 A.2d at 437, the following testimony also supported the divorce on the grounds of indignities:

In another incident, appellee placed their youngest child in his car, seized appellant who was on the outside of the car attempting to restrain him, and drove down an "extremely long hill," dragging appellant alongside the car. While they lived in Virginia, appellee's drinking habits were so costly that appellant was forced to seek employment in order to support herself. Additionally, appellee had frequently threatened to commit suicide. As a result of

these experiences, appellant lost eighteen pounds and was placed on tranquilizers by her physician.

In *Kramer v. Kramer*, 194 Pa.Super. 538, 168 A.2d 624 (1961), a divorce was granted on the ground of indignities with the weakest set of facts that our research discloses. Yet even there, in addition to the fact that the wife's "friend" became her boarder after the married couple separated, the court found that the wife "frequently found fault with plaintiff's conduct and habits, criticized him, nagged him, became enraged and repeatedly called plaintiff abusive names." *Id.*, 194 Pa.Super. at 540, 168 A.2d at 626.

■ An accurate statement of when evidence of an extramarital relation may be sufficient to prove indignities appears in *Lapiska v. Lapiska, supra*, 202 Pa.Super. at 612, 198 A.2d at 389, where it is said:

> However, the extent and nature of the association must be considered. The existing rule in such cases is that the mere existence of affection for a third person, which arouses the jealousy of the libelant, does not constitute indignities to the libelant; but the open exhibition by respondent of that affection may constitute indignities to the person if sufficiently serious to bring upon the spouse continued shame, humiliation and disgrace. There must be an open and notorious exhibition of improperly placed affection. *Harding v. Harding*, 156 Pa.Super. 438, 40 A.2d 869 (1945).

In *Lapiska* the husband testified as follows:

> Except for the "Gawryk affair" the only evidence concerning appellant's association with another man prior to the separation was given by appellee. He testified that on February 20, 1960, he left for work shortly before 10:00 P.M. but returned shortly thereafter to find his wife fully dressed, standing in the doorway of their home talking to a man. She had been dressed in a housecoat prior to his departure. As he approached the door, his wife went indoors and the man ran to his car. After demanding to know who the man was and being told that he was selling raffle tickets, appellee left again but waited near the

house to see what would occur. Shortly thereafter he saw his wife go behind the house and get into the car with the man. He followed them in his car but lost them in traffic. *Id.*, 202 Pa.Super. at 612, 198 A.2d at 389.

This testimony, and testimony regarding several other alleged incidents, was found insufficient to support a finding of indignities. *Cf. Macormac v. Macormac, supra.*

The evidence here was insufficient to satisfy the *Lapiska* test; it neither showed "an open and notorious exhibition of improperly placed affection"; nor did it show conduct by the wife "sufficiently serious to bring upon the [husband] continued shame, humiliation and disgrace." The law does not provide that because a woman has a male friend she will lose the right of support.

The order of the lower court is reversed, and the record remanded with instructions to reinstate the order of support.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.