419 A.2d 49

**Leonard S. KELLER**

v.

**Rochelle M. KELLER, Appellant.**

Superior Court of Pennsylvania.

Argued June 14, 1979.

Filed Feb. 15, 1980.

Reargument En Banc Denied April 30, 1980.

Petition for Allowance of Appeal Denied Nov. 17, 1980.

Louis Lipschitz, Philadelphia, for appellant.

Jack A. Rounick, Norristown, for appellee.

Before SPAETH, STRANAHAN and SUGERMAN, JJ.*

SPAETH, Judge:

This is an appeal from two orders, one granting appellee–husband a divorce based upon indignities to the person,[1] and the other denying appellant–wife support.

* President Judge JOHN Q. STRANAHAN of the Court of Common Pleas of Mercer County, Pennsylvania, and Judge LEONARD SUGERMAN of the Court of Common Pleas of Chester County, Pennsylvania, are sitting by designation.

1. *See* Act of May 2, 1929, P.L. 1237, § 10, *as amended*, 23 P.S. § 10 (Purdon's 1955).

On March 18, 1977, the husband filed a complaint for divorce, alleging indignities and including a separate count requesting that the court find that the wife was not entitled to support. The court appointed a master, and hearings were held on June 3 and 6, July 21 and 22, and August 18 and 19, 1977. When the master ruled that he could not hear testimony on the support issue, the wife filed a petition for support; after the master's hearings, she filed a petition for alimony pendente lite, counsel fees, and expenses. On December 14, Judge CIRILLO, *sua sponte*, consolidated the petition for support with the divorce action, and the next day, without a hearing, he ruled that the wife was not entitled to support. On September 27, 1978, Judge VOGEL entered a decree granting the husband a divorce based on indignities.

–1–

On an appeal from a divorce decree, we are obliged to make an independent review of the record. *Barr v. Barr*, 232 Pa.Super. 9, 331 A.2d 774 (1974); *Nacrelli v. Nacrelli*, 288 Pa. 1, 136 A. 228 (1927). However, "[a] report of a master, who has had the advantage of seeing and hearing the parties and their witnesses, is, nevertheless, to be given fullest consideration." *Vautier v. Vautier*, 138 Pa.Super. 366, 367, 11 A.2d 207, 208 (1939). *See also Lyons v. Lyons*, 116 Pa.Super. 385, 176 A.2d 792 (1935).

To make out a charge of indignities, three elements must be proved: (1) a course of conduct that, although varying according to the circumstances of each case, must in every case (2) be inconsistent with the marital relationship, and (3) render the condition of the innocent party intolerable and his or her life burdensome. *Steinke v. Steinke*, 238 Pa.Super. 74, 87, 357 A.2d 674, 680–81 (1976) (SPAETH, J., concurring) (collecting cases). Although no general rule can be formulated as to what constitutes indignities in a particular case, the matter being one that depends upon all the circumstances of the particular case and the position in life, character, and disposition of the parties, *Margolis v. Margolis*, 201 Pa.Super. 129, 133, 192 A.2d 228, 230 (1963), our cases

hold that proof of "vulgarities, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, or malignant ridicule" may be sufficient to make out a case for divorce based on indignities. *Barton v. Barton*, 248 Pa.Super. 278, 283, 375 A.2d 96, 98 (1977). *See also Bristol v. Baranyi*, 259 Pa.Super. 418, 393 A.2d 897 (1978). Moreover, several of these factors "may coalesce to justify a finding of indignities, although taken separately, no single incident or factor would be sufficient." *Barton v. Barton, supra,* 248 Pa.Super. at 283, 375 A.2d at 98. Finally, it should be noted that in the present case, the burden of proving indignities was on the husband as the party seeking the divorce, *Mintz v. Mintz*, 258 Pa.Super. 187, 392 A.2d 747 (1978); *Taddigs v. Taddigs*, 200 Pa.Super. 29, 186 A.2d 455 (1962), and that the husband was required to prove that he was an innocent and injured spouse, *Mintz v. Mintz, supra.*

Among the master's findings were the following. The parties were married on March 1, 1959 in New York City. After living in New York for approximately one and one-half years, they moved to Plymouth Meeting in Montgomery County, Pennsylvania. The parties have two children: Scott, born December 17, 1960, and Bruce, born January 4, 1963. The family lived together in Montgomery County until March 18, 1977, when the husband and Scott moved out. The master does not identify any beginning of the parties' marital problems; rather he points to several actions on the part of the wife as showing indignities on her part. In summary, the master found that the wife had intentionally tried to isolate the children from their father; that she knowingly permitted the virtual exclusion of the father from Bruce's Bar Mitzvah pictures; that she eliminated the husband's name from the program book at Scott's religious confirmation; that she made a comment to her husband that she would abandon him if he had a stroke; that she acted disrespectfully toward her husband and his family when her husband's mother died; that she hired an architect to make changes to their house without his approval; that she fre-

quently berated him before his family and friends; and finally, that she engaged in a campaign of harassment against him within their home. Many of these findings turned on the master's opinion that the husband and his several supporting witnesses presented a more credible version of the marriage than the wife and her one supporting witness.[2]

After examining the master's findings in the context of the entire record, as we have independently reviewed it, we have concluded that the husband has proved that he is entitled to a divorce. This is a difficult conclusion because the master's findings are somewhat misleading and incomplete; nevertheless, the record supports certain key findings, and persuades us to affirm the lower court's decree.

The relationship between the parties appears to have had little life for many years prior to the divorce. Both husband and wife agreed that by 1971 or so it had become apparent that they had different interests, and that there was little

2. The master, noting the husband's demeanor and candid recollections, found the husband to be a more credible witness than the wife, Master's Report at 17. The master, however, also stated that the wife was a less credible witness because she did not produce as many corroborating witnesses as her husband. Master's Report at 11. Indeed, the master went further and stated that the wife should have produced such witnesses, and that the witnesses' absence "leads me to believe that if they had been called, they would not have helped Defendant. This detracts from her credibility." Master's Report at 11. The wife correctly points out that the master had no basis for drawing such an inference. In *General Electric Cr. C. v. Aetna Cas. and Surety Co.*, 437 Pa. 463, 477 n.18, 263 A.2d 448, 456, n.18 (1970), the Court stated:

> It is generally agreed that when a potential witness is available and appears to have special information relevant to the case, so that his testimony would not merely be cumulative, and where his relationship with one of the parties is such that the witness would ordinarily be expected to favor him, then if such party does not produce his testimony, the inference arises that it would have been unfavorable.

Here, the master could not know whether the witnesses in question were available to testify. Notwithstanding the master's unfortunate inference, we are constrained to rely on him for findings of credibility, *Vautier v. Vautier, supra*, and we think that his comments suggest that even if he had not drawn the inference he did, he would have found the husband a more credible witness than the wife.

communication between them on a daily basis. N.T. at 15 (June 3, 1977); N.T. at 109 (July 22, 1977). The husband seems to have been consumed with his job and to have complained that his wife expected him to provide conversation at night and to plan weekends. N.T. at 12, 13 (June 3, 1977). The wife acknowledged that she asked him to converse with her more, N.T. at 109 (July 22, 1977), stating that he was indifferent and cool. N.T. at 109 (July 22, 1977). The wife testified further that when she asked him a question, even when it was about the behavior of one of the children, she rarely got a response. N.T. at 109 (July 22, 1977). The impasse in the marriage lead the parties to seek marriage counseling in the spring of 1974. N.T. at 119 (July 22, 1977). The results of the counseling, which continued until October 1975, were inconclusive at best. N.T. at 121 (July 22, 1977). Indeed, 1975 proved to be a particularly bad year. Early in 1975, the husband suffered pronounced business reverses, which required the parties to make various cutbacks in their style of living. N.T. at 34 (June 3, 1977). In March 1975, the husband's mother died. The wife went to the funeral in New York, but refused to go to the cemetery or to return to the husband's brother's home after the services. N.T. at 35 (June 3, 1977). Instead, she went into New York City and shopped for the children. N.T. at 36 (June 3, 1977). The husband described her absence after the funeral as the "most humiliating thing I've ever had to bear." N.T. at 36 (June 3, 1977). The relationship between the parties continued to deteriorate through the spring of 1975, and by the summer, when the parties went away to the beach together for three weeks, there was continual fighting. N.T. at 38, 39 (June 3, 1977). The husband stated that at the beach there was simply "no agreement, no compatibility" between the parties. N.T. at 39 (June 3, 1977). At one point, the wife hired an architect to make changes in the house without her husband's approval and he refused to pay the bill. N.T. at 29 (June 3, 1977). In the fall of 1975, the relationship became extremely strained. In September, the husband, without informing the wife, removed some gold coins from a joint safe deposit box, and transferred $20,000

from a jointly owned account to a bank in New York. N.T. at 122, 123 (July 21, 1977). One of the husband's friends who testified on his behalf conceded that he had advised the husband that it might be necessary to put financial pressure on the wife to get her to accept a divorce on his terms. N.T. at 92 (June 3, 1977). Another friend who testified for the wife stated that the husband had told him that "he felt that he wanted to get out of this marriage, that he felt it was a bad business arrangement, and one of the best ways to do it was to exert pressure." N.T. at 7 (August 19, 1977). Sometime in the fall of 1975, the husband cut down on weekly household payments to the wife and she hired an attorney to represent her. N.T. at 124 (July 21, 1977). At some point, during that fall or winter, the wife moved out their common bedroom and began sleeping in another part of the house. N.T. at 23 (June 6, 1977).

Given the breakdown in the marriage by the end of 1975, many of the master's findings are not particularly probative of indignities, for they relate to events that occurred in 1976; if the wife did engage in misconduct then, it is readily explainable by the mutual animosity existing between the parties.

The master's finding that the wife intentionally influenced her children against their father is partially documented by the record. The older son, Scott, testified that his mother discouraged him from any contact with his father in 1975–76. N.T. at 22, 23 (June 6, 1977). Nevertheless, the wife's action is not difficult to understand given that the husband had already taken steps to end the marriage. Nor was the husband devoid of responsibility for the breakdown in communication with Scott. Scott and his father had several nasty encounters in early 1976. At one point, the two had an argument over the use of hot water in the house, N.T. at 35 (June 6, 1977), which escalated into an ugly argument between the parents. On the morning of Bruce's Bar Mitzvah in January 1976, the husband threatened to "punch" Scott off the religious platform at the service if he attempted to act as a surrogate father to Bruce. N.T. at 126

(July 21, 1977). At some point in the spring of 1976, the husband threatened to disown Scott. N.T. at 143 (July 21, 1979); N.T. at 28 (August 18, 1979). The relationship between Scott and his father was strained at the time of Scott's religious confirmation in June 1976. Although the wife did admit that she did not put her husband's name in the confirmation book, N.T. at 125–126 (August 18, 1977), her husband did not show any genuine interest in the event or its planning. N.T. at 142 (July 21, 1977). He did not spend any time with Scott during the summer of 1976. N.T. 79 (June 6, 1977). It was only in the fall of that year that he began to take any major interest in Scott. N.T. at 58 (June 3, 1977). Regrettably, once the husband chose to take an interest in Scott, the wife undertook a campaign against Scott–depriving him of meals and telling the maid not to clean his room–, N.T. at 58 (June 3, 1977) which eventually resulted in Scott moving out with his father in March 1977.

Nor are the husband's actions free from fault with regard to his other child, Bruce. The record does not indicate a great deal about the relationship between Bruce and his father; it appears that during 1975–1976 the wife steered Bruce away from the husband, as she did with Scott. It is not clear, however, that she alone was responsible for her husband's exclusion from Bruce's Bar Mitzvah picture album. Bruce did not testify. Eric Rose, the photographer at the Bar Mitzvah, testified that the wife had told him that it was Bruce's wish that his father not be included in the album. N.T. at 4 (June 6, 1977). Even assuming that the wife did strongly influence Bruce to exclude the husband from the album, this was not entirely without justification given the husband's behavior prior to the affair. The parties had originally scheduled a large affair for Bruce but the husband cancelled it because of his strained finances and the bad relationship between the parties. N.T. at 127 (July 21, 1977). He then volunteered to have a smaller affair, but reneged on that. N.T. at 125 (July 21, 1977). The husband did participate in the religious services that were held, but the wife ended up organizing an affair on her own at their

house. Given this background, it is not difficult to understand why she sought to exclude the husband's picture from the album.

Were the master to have relied only on the findings just discussed, it is doubtful that we could affirm the lower court's decree. The events of 1975 suggest that the parties were equally at fault for the breakdown in the marriage. Indeed, when the husband explained why he had cancelled Bruce's Bar Mitzvah, he stated that "it would be a sham to have a party and look like a happy couple when there was nothing but sorrow and heartache around," N.T. at 127 (July 21, 1977), and then he conceded that the parties had equally contributed to the sorrow and heartache, N.T. at 128 (July 21, 1977). It is axiomatic that "where both parties are nearly equally at fault, so that neither can clearly be said to be the injured and innocent spouse, the law will grant a divorce to neither on the ground of indignities to the person, but will leave them where they put themselves." *Simons v. Simons*, 196 Pa.Super. 650, 656, 176 A.2d 105, 108 (1961). *See also Lapiska v. Lapiska*, 202 Pa.Super. 607, 198 A.2d 386 (1964); *Shoemaker v. Shoemaker*, 199 Pa.Super. 61, 184 A.2d 282 (1962); *Rankin v. Rankin*, 181 Pa.Super. 414, 124 A.2d 639 (1956).

However, the master has made certain other findings that we accept and on the basis of which we find that the fault for the breakdown in the marriage is mostly the wife's.

The master found that the husband was subjected to a steady flow of verbal abuse over the years. The record supports this. The husband testified that even when the parties had the slightest conversation in 1972, 1973, and 1974, they would wind up in a full–blown argument, with the wife addressing him as a "schmuck, putz, stupid, idiot . . . ." N.T. at 70 (June 3, 1977). Moreover, it appears that the wife would repeat these statements in front of Scott, N.T. at 71 (June 3, 1977), and the husband's relatives. N.T. at 111 (June 3, 1977). The husband's sister–in–law testified that the parties were always bickering, and that

the wife would refer to her husband as "the big slug, or the big schmuck, the big this if he was playing ball with the kids." N.T. at 111 (June 3, 1977). Two of the husband's friends testified to similar abuse. One Stanton Berkowitz testified that he and his family had first met the parties at a skiing resort in New Jersey in 1970 or 1971. One day the husband took the wrong chair lift up a ski slope and the wife berated him. Berkowitz paraphrased the wife's comments as follows:

> [S]he said, you stupid son of a bitch, he doesn't know his ass from second base, I don't know what the hell he's doing, he never knows what the hell he's doing, and that type of conversation.

N.T. at 85 (June 3, 1977).

The next time the Berkowitzs went away with the husband and wife was in 1974 for Easter in Florida. Berkowitz testified that "there was a tremendous air of tension every time that Shelley [the wife] came to the beach that Leonard [the husband] was there." N.T. at 87 (June 3, 1977). He said that the wife would constantly refer to the husband as a "stupid son of a bitch," on one occasion calling him a "big fat slob." N.T. at 87 (June 3, 1977), and that if she were sitting on the beach and he showed up, she would leave, saying, "I am not going to sit with that son of a bitch." N.T. at 88 (June 3, 1977). One David Rose, a business acquaintance of the husband's, was also in Florida that Easter with the Berkowitzs and Kellers. It appears that on one occasion, when the wife sent the husband to the store to get something, she said to Rose's wife that "I sent the dummy to the store." N.T. at 109 (June 6, 1977), and that on another occasion, she described her husband as being "fat and overweight, not making a nice appearance in a bathing suit." N.T. at 109 (June 6, 1977). The Roses also went out with the husband and wife several times in Philadelphia. David Rose testified that on these occasions the wife was constantly highly critical of her husband. N.T. at 112 (June 3, 1977). One of the husband's employees, one Ronald Fetzer, testified that he was present when the wife castigat-

ed the husband for allowing a doctor in Philadelphia to remove a cast that had been placed on his leg by a doctor at a ski resort after an accident. N.T. at 124–125 (June 3, 1977).

Another of the master's findings that is disturbing is with respect to an incident that the master found took place before a marriage counselor sometime in 1974. While they were discussing the possibility of the husband having a stroke, the wife made the following comment:

> When you have your stroke, and the spittle is rolling down your chin, don't expect me to be there to take care of you. I will wheel you out into the sun and take off.

N.T. at 18 (June 3, 1977).

The master found the wife's denial of this statement unconvincing.[3]

Finally, the master found that the wife conducted a campaign of harassment of the husband after 1975. The husband testified that he saw the wife close the heat register and bend the handle, precluding him from getting heat in the master bedroom; that she left the lights on in his closet; and that she moved furniture in the bedroom to preclude him from getting heat in the winter or cooling in the summer. N.T. at 48–51 (July 22, 1977). There were also other incidents of harassment, which the husband claimed the wife performed, although he did not actually see her perform them. N.T. at 48 (July 22, 1977). This testimony as to harassment is of some weight, although, as with the Bar Mitzvah and the confirmation incidents, it must be remembered that it closely followed a period in which there was much mutual acrimony between the parties.

---

**3.** The master criticizes the wife for not bringing in the marriage counselor to corroborate her denial of this statement, and suggests that this detracts from her credibility. Master's Report at 13. Again, the master appears to be drawing an unwarranted inference. *See* n. 2 *supra*. Nevertheless, the master also stated that the wife's denial "was weak and not worthy of belief, *especially when personally observed in its making.*" Master's Report at 14. (Emphasis added.).

Taken as a whole, the record persuades us that there was such "manifest disdain, abusive language, or malignant ridicule" by the wife as to warrant a divorce based on indignities. *Barton v. Barton, supra*, 248 Pa.Super. at 283, 375 A.2d at 98. Nor is the evidence that the husband was not an "innocent and injured spouse" sufficient to deny him a divorce. While we have commented on certain aspects of the record that do not reflect favorably upon the husband, nevertheless, there are other aspects that cannot be explained by the husband's failings. In *Sells v. Sells*, 228 Pa.Super. 331, 335, 323 A.2d 20, 22 (1974), this court stated:

> "Although the lower court states in its opinion that the husband cursed his wife, pulled her, threw an ashtray at her, pulled her down, 'and threw her out of the house,' the findings of fact by the Master, who heard the evidence and observed the witnesses and who was in a better position to determine credibility of husband and wife, found overwhelmingly that the conduct of the wife was so predominately destructive to the marital relationship in its many and varied instances of indignities, that in totally *[sic]* the husband's indiscretions were considered by the Master to be minimal as contrasted to the prolonged and extreme conduct displayed by the wife."

Here, a similar comment may be made regarding the wife's conduct, and the husband's conduct, which perhaps hastened the breakdown in the marriage, must be considered in that context. "Although the burden of proving himself to be an innocent and injured spouse was upon the husband, the law does not require that he be wholly free from fault." *Rhinehart v. Rhinehart*, 197 Pa.Super. 558, 561, 180 A.2d 82, 84 (1962); *Colin v. Colin*, 190 Pa.Super. 125, 133, 151 A.2d 801, 805 (1959).

–2–

▮ Appellant argues that the lower court erred when it denied her support without a hearing. Technically, this argument has merit. The Divorce Law of 1929, *as amended*, 23 P.S. § 36 (Purdon's Supp. 1979–1980) states:

> A master may be appointed by the Court to hear testimony on all or some issues, except issues of custody, paternity and support . . . .

In addition, Pa.R.Civ.P. 1133(a)(1) provides:

> After the action is at issue, the court shall hear the testimony or upon its own motion or the motion of either party may, except as the issues of custody, paternity and support, appoint a Master.

In *Commonwealth ex rel. Rubin v. Rubin*, 230 Pa.Super. 591, 326 A.2d 578 (1974), we interpreted these two provisions as preventing a master from taking any testimony as to a wife's alimony claim and requiring that the court do so instead. Nevertheless, a remand for a support hearing would serve no purpose, given our holding that appellee has shown grounds for divorce. It is established that the obligation of support terminates when it is shown that the conduct of the financially dependent spouse provides a ground for divorce. *Narbesky v. Narbesky*, 255 Pa.Super. 48, 386 A.2d 129 (1978); *Commonwealth ex rel. Young v. Young*, 213 Pa.Super. 515, 247 A.2d 659 (1968).

We shall, however, remand this case to the lower court for hearing and disposition of appellant's petition for alimony pendente lite, counsel fees, and expenses. We have examined the docket entries in the record and can find no order disposing of appellant's petition. It is clear that a petition for alimony pendente lite is not the equivalent of a petition for support. In *Wargo v. Wargo*, 184 Pa.Super. 587, 589, 590, 136 A.2d 163, 165 (1957), we stated:

> The purpose of alimony pendente lite is to enable the wife to maintain the principal action, and it differs somewhat in character from an order for support: *Hanson v. Hanson*, 177 Pa.Super. 384, 110 A.2d 750; *Commonwealth ex rel. Lipschultz v. Lipschultz*, 179 Pa.Super. 527, 117 A.2d 793. See also *Commonwealth ex rel. Kralik v. Kralik*, 137 Pa.Super. 565, 9 A.2d 921. The existence of an order of the court of quarter sessions requiring a husband to pay support to his wife does not prevent the court of common pleas from awarding alimony pendente lite, *Heilbron v.*

*Heilbron,* 158 Pa. 297, 27 A. 967, nor is the refusal of the court of quarter sessions to enter an order of support a bar to a claim for alimony pendente lite in a subsequent divorce proceeding in the common pleas: *Dicken v. Dicken,* 56 Pa.Dist. & Co.R. 531. Conversely, neither the existence nor vacation of an award of alimony pendente lite in the court of common pleas is a bar to the securing of an order for support in the court of quarter sessions: *Commonwealth v. MacMaster,* 88 Pa.Super. 37; *Commonwealth v. Scholl,* 156 Pa.Super. 136, 39 A.2d 719. The two proceedings may run concurrently: *Commonwealth ex rel. Mosey v. Mosey,* 147 Pa.Super. 466, 24 A.2d 59.

In *Wiegand v. Wiegand,* 242 Pa.Super. 170, 176, 363 A.2d 1215, 1218 (1976), we further stated:

At the time that *Wiegand I* was decided, it was a principle of long standing that a woman was entitled to alimony pendente lite, counsel fees and expenses whether she is a plaintiff or defendant in a divorce proceeding: "The rule is founded upon elementary principles of justice. The denial of support to an injured wife during the dependency of her suit against her husband, or of the counsel fees and expenses occasioned thereby, would, by the closing of his purse, surrender to his control her right to secure redress. Even stronger is the need where the wife is the respondent; for by cutting her off from support and the means of employing counsel and meeting the expenses of the litigation, the libellant could prevent her from contesting his suit, however unfounded it might be." 2 Freedman, *Law of Marriage and Divorce in Pennsylvania,* § 429, at 890 (2d Ed. 1957) (Footnote omitted.).

Moreover, the obligation to pay alimony pendente lite extends until an appeal, if an appeal is taken, is finally decided. *Jack v. Jack,* 253 Pa.Super. 538, 385 A.2d 469 (1978).

The order granting appellee a divorce is affirmed.

The order denying appellant support is affirmed.

The case is remanded for disposition of appellant's petition for alimony pendente lite, counsel fees, and expenses.